THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD R. ANDERSON, Defendant-Appellant.

Third District    No. 3—90—0807

Opinion filed January 24, 1992.—Rehearing denied March 24, 1992.

Arthur J. Inman, of Peoria, for appellant.

Marc Bernabei, State's Attorney, of Princeton (Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

The defendant, Donald R. Anderson, was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14) after a jury trial and sentenced to a 15-year term of imprisonment. Defendant raises the following issues on appeal: (1) whether the trial court erred in denying defendant's motion to suppress certain statements

he allegedly made to investigators; (2) whether defendant was proved guilty beyond a reasonable doubt; (3) whether the trial court erred in admitting evidence of other crimes; (4) whether the court erred in admitting hearsay testimony of statements attributed to the victim; and (5) whether defendant's sentence is arbitrary and excessive. We affirm defendant's conviction and sentence.

### SUPPRESSION HEARING

Defendant filed a motion to suppress certain statements he allegedly made in the presence of William St. Arnold, an investigator for the Department of Children and Family Services (DCFS), and John Pate, a special agent for the Division of Criminal Investigation of the Illinois State Police. The testimony presented at the suppression hearing indicated that St. Arnold, Pate and Janelle Beltramini, director of the State's Attorney's child protection services division, went to the clothing store owned by defendant on May 31, 1990, to interview him regarding complaints by defendant's adopted 10-year-old son, J.A., of sexual abuse. The investigators arrived at the store at approximately 2:40 p.m. The store was open for business but the defendant was alone. St. Arnold told the defendant why they had come, that he did not have to talk to them, and that he could ask them to leave at any time. No *Miranda* warnings were given to defendant.

According to St. Arnold, defendant agreed to talk to the investigators and they interviewed him for about an hour before being interrupted by a telephone call from defendant's wife. Shortly thereafter, Mrs. Anderson entered the store and told the defendant that he shouldn't talk to the investigators unless his attorney was present. The defendant responded that he wanted to get the matter cleared up and Mrs. Anderson left. The investigators continued to interview the defendant, although there were several interruptions while defendant spoke briefly to people who entered the store. St. Arnold testified that after Beltramini left for an appointment, the defendant admitted that he had kissed J.A.'s penis on three or four occasions. Shortly thereafter Mrs. Anderson returned to the store and defendant then twice repeated the statement that he had kissed J.A.'s penis. Mrs. Anderson telephoned an attorney, and St. Arnold and Pate left the store. St. Arnold testified that at no time during the interview did the defendant ask the investigators to leave the store or seek to end the interview.

On cross-examination, St. Arnold acknowledged that the reason for interviewing the defendant was to gather evidence regarding J.A.'s claims of sexual abuse. St. Arnold denied shouting at the

defendant and also denied shaking his fist at Mrs. Anderson and telling her to leave the store. Beltramini's testimony was substantially in accord with St. Arnold's, although she did not hear defendant's alleged admissions of kissing J.A.'s penis because she left for an appointment before the statements were made. Pate's testimony concerning the interview of defendant was consistent with that related by St. Arnold, including that defendant had admitted kissing J.A.'s penis on three or four occasions and that defendant twice repeated the statement in Mrs. Anderson's presence.

Robert Lautzenhiser testified that he visited the defendant's store on the afternoon of May 31, 1990. Upon entering the store, Lautzenhiser saw the defendant and his wife and two or three men that he didn't recognize. The defendant appeared to be very agitated and he and one of the men were "practically nose to nose" and talking in loud voices. Mrs. Anderson was very upset and she asked Lautzenhiser to leave the store because there was a problem with J.A.

William Nelson testified that he works at a drugstore near the defendant's clothing store. On the afternoon of May 31, 1990, Mrs. Anderson entered the drugstore and was very upset. Nelson helped her telephone a lawyer and gave her a glass of water and a cigarette.

Defendant Donald Anderson testified that he was 61 years old, the owner of Anderson Clothing and Shoes, and a lifelong resident of Princeton, Illinois. St. Arnold, Pate and Beltramini came to his store on the afternoon of May 31, 1990, and introduced themselves. According to the defendant, St. Arnold stated that he wanted to discuss J.A.'s allegations of sexual abuse and that he would like to be able to tell the State's Attorney that defendant had cooperated so that the State's Attorney would take it easy on him. St. Arnold told the defendant that they had a good case against him, that J.A.'s story remained constant, and that defendant was guilty of molesting him. Defendant said that these accusations frightened him and he asked what he was supposed to have done. St. Arnold replied that defendant and J.A. had engaged in oral sex at the defendant's clothing store. Defendant stated that St. Arnold was screaming and very upset and defendant denied the allegations.

Defendant further testified that he and St. Arnold discussed J.A.'s history of running away and other difficulties defendant had with J.A. Defendant denied admitting that he had kissed J.A.'s penis on three or four occasions. Several people, including Robert Lautzenhiser, entered the store while defendant was being questioned but defendant told them to come back at another time. Mrs. Anderson came to the store about an hour after the investigators arrived. Ac-

cording to defendant, St. Arnold shook his fist at Mrs. Anderson and told her to get out of the store. She tried to argue with St. Arnold and tried to use the telephone but was unable to because of the shouting. She then went to the drugstore to call an attorney.

Defendant testified that he did not receive any *Miranda* warnings, but he was told that he did not have to talk to the investigators and that they would leave at his request. However, defendant stated that he told the investigators three times that he wanted an attorney and also asked them to leave three times but they ignored his requests. Defendant again denied admitting that he kissed J.A.'s penis.

On cross-examination, defendant testified that the statement that the State's Attorney would go easy on him if he cooperated frightened him. It did not, however, have any effect on his decision to cooperate or answer questions because he had made that decision before the statement was made. Although defendant responded negatively when asked whether he believed he was under arrest at any time during the interview, defendant also stated that when the investigators ignored his requests to leave he thought that he probably was not free to go. Defendant acknowledged that the investigators told him that he did not have to speak to them and that he could terminate the interview at any time and that he agreed to cooperate and answer their questions. The trial court denied defendant's motion to suppress, finding that the interview was noncustodial and that the defendant's statements were made voluntarily.

Defendant contends that the trial court erred in failing to suppress the statements in which he purportedly admitting kissing J.A.'s penis. Defendant first argues that the interview at his store was a custodial interrogation requiring *Miranda* warnings. We do not agree.

*Miranda* applies only to custodial interrogations. (*People v. Finklea* (1983), 119 Ill. App. 3d 448, 456 N.E.2d 680.) A defendant is in custody when, considering all the circumstances surrounding the questioning, a reasonable innocent person would have believed that he was not free to leave or was expressly or implicitly bound to remain in the presence of police. (*People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.) The factors to consider include: the location, time, length and mood of the interrogation; the number of interrogators and the presence or absence of friends or family of the defendant; any indication of formal arrest; whether the defendant voluntarily assisted in the investigation; whether the defendant was allowed to walk about the location of the questioning unaccompanied by his questioners; and the age, intelligence and mental makeup of the defend-

ant. *Finklea*, 119 Ill. App. 3d 448, 456 N.E.2d 680; *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226.

▪ Based on the evidence presented at the suppression hearing, we find that the defendant was not in custody when he was questioned on May 31, 1990, and therefore no *Miranda* warnings were required. Defendant voluntarily submitted to questioning at his place of business. Although there was testimony that St. Arnold shouted at the defendant and told Mrs. Anderson to leave the store, the investigators testified to the contrary, and the resolution of such issues is the province of the trial court. Similarly, whether the defendant's requests to terminate the interview were ignored was a question of fact for the trial judge. (See *People v. Foster* (1990), 195 Ill. App. 3d 926, 552 N.E.2d 1112 (whether defendant is in custody is a factual question determined on a case by case basis).) Defendant testified that he did not believe that he was under arrest at any time during the interview, that he was told that he did not have to answer any questions, and that he agreed to cooperate. Defendant also indicated that he briefly spoke with customers who entered the store during the questioning. Considering all the circumstances, we do not believe that defendant was in custody nor deprived of his freedom in any significant way.

Defendant also maintains that even if the interview was noncustodial, his statements should have been suppressed as involuntary. Although not entirely clear, defendant appears to argue that his statements were induced by the promise that the State's Attorney would go easy on him if he cooperated or were coerced by the "accusatory, angry, and intense" mood of the questioning.

▪ Whether a confession is voluntary depends upon an examination of the totality of the circumstances to determine whether the defendant's will was overborne. (*Foster*, 195 Ill. App. 3d 926, 552 N.E.2d 1112.) A trial court's finding of voluntariness will not be overturned unless it is against the manifest weight of the evidence. (*People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949.) In this case the purported promise of leniency did not render defendant's statement involuntary, since the defendant admitted that it had no effect on his decision to cooperate because he had made that decision prior to the promise. Nor do we believe that the angry and accusatory mood of the questioning as described by the defendant, even if believed by the trial judge, was sufficiently coercive to support a finding that the statements were made involuntarily.

TRIAL

Defendant's next contention, that he was not proved guilty beyond a reasonable doubt, requires a review of the evidence presented at trial. Mary Lou Anderson, the defendant's wife, described the clothing store as long and narrow with glass windows across the front and having a glass door. The shoe fitting area is in the back of the store and is visible from the street, even though there are waist-high counters in the store. Mrs. Anderson believed that even if someone was lying down behind the counters they could be seen from the street.

Mrs. Anderson told how she and the defendant adopted two girls and then adopted J.A., who was the brother or half-brother of one of the girls, when he was 2½ years old. J.A. had various medical problems, including a cleft palate, cleft lip, and club foot. He had been in several foster homes and exhibited behavioral problems such as punching and kicking his siblings and using profanity. J.A. would also frequently run away or stay away from home and the police would often have to be called to find him. Once he told police that he had been sleeping under the bleachers at a ballpark for three nights, although he had not. In June of 1989 the Andersons decided to relinquish custody of J.A. and he was placed in foster care. J.A. returned to the Andersons' home in August of 1989 and shortly thereafter he began running away again. In November of 1989 J.A. was placed in the Zeller Mental Health Center for evaluation. J.A. was returned to the Andersons in January of 1990, but his behavioral problems resumed after a few weeks and he was removed from the Andersons' home at their request on April 25, 1990, and placed in a foster home. Mrs. Anderson testified that J.A. and the defendant were not usually in the store alone together and J.A. had never expressed any fear of the defendant nor indicated that defendant was sexually abusing him.

J.A., who was 10 years old at the time of trial, testified that Mrs. Anderson usually took him to defendant's store on Fridays to keep defendant company. J.A. related an incident that occurred at the store about a week before he was removed from the Andersons' home in April of 1990. J.A. and the defendant were alone in the store on a Friday after the store had closed. According to J.A., after counting the day's receipts, the defendant went to a corner area in the back of the store near the shoe chairs. Defendant lay down and pulled down his pants and underwear. Defendant then asked J.A. to lie down and lower his pants and underwear and he complied. Defendant put his hand on J.A.'s penis and moved it up and down for one or two min-

utes, asking J.A. if it felt good. J.A. did not reply, but at trial he testified that it felt "weird." J.A. stated that he then stroked defendant's penis at defendant's request and defendant's penis "got hard." Defendant then sat up and bent over and put his mouth on J.A.'s penis for about a minute. J.A. described this as feeling "wrinkly" and "weird" and said that his penis got hard a little bit. The defendant then finished counting the day's receipts and they went home.

J.A. further testified that similar incidents had taken place about once a week over the past two years, beginning when he was in second grade. On some of these occasions the defendant would say that his penis "was going to go off" and he would take out a handkerchief, put it over his penis, and wipe off the "yellowish white colored stuff" that came out of his penis. Defendant then washed out the handkerchief in a sink and put it on a line to dry. J.A. also testified that he sometimes put his mouth on defendant's penis at his request and it was "wrinkly" and "after a while it got hard."

J.A. testified that the reason that he often ran away or stayed out when he was not supposed to was because he was afraid of defendant. J.A. stated that he had not run away from his current foster home and that his school grades had improved from D's and F's to A's and B's. J.A. said that the reason he did not tell anyone about what was happening to him until a month after he left the Andersons was because he was living with defendant and was afraid defendant would hurt him.

Bruce Dannenberger, associate director of the Mental Health Center of La Salle County, testified that DCFS referred J.A. to him in June of 1989 for an assessment. Dannenberger met with J.A. 22 times in an attempt to determine why he repeatedly ran away, but he was unable to do so. Dannenberger asked J.A. a number of times if he was being sexually abused, but J.A. responded negatively. Because he was unable to discover the cause of J.A.'s behavioral problem, Dannenberger recommended an inpatient evaluation at Zeller Mental Health Center. J.A. was admitted to Zeller in November 1989 and remained there for about six weeks. Zeller was also unable to discover the nature of J.A.'s problems and he was returned to the Andersons in January 1990. J.A. continued to meet with Dannenberger. According to Dannenberger, on May 26, 1990, J.A. told him that defendant had been "playing with him." In response to Dannenberger's questions, J.A. explained that after defendant closed the store on Friday night they would go to the shoe department in the back of the store, where each would stroke the other's penis and they would engage in

oral sex. Dannenberger also noted that since leaving the Andersons' home, J.A.'s attitude and school grades have improved markedly.

On cross-examination Dannenberger agreed that while J.A. was at Zeller he had been told that he would not be returning to the Andersons' home and that J.A. indicated that he did want to return there. Dannenberger also agreed that when J.A. was removed from the Andersons' home in April of 1990, he did not exhibit the kind of reaction one might expect from a child who had been removed from an abusive environment. At the time that J.A. was admitted to Zeller, Dannenberger had reached a working hypothesis that he was suffering from reactive attachment disorder of infancy or early childhood. Such a condition is marked by a disturbed social relatedness resulting from grossly pathogenic care during childhood, with onset of the condition occurring before age five.

William St. Arnold testified concerning an interview with J.A. on May 29, 1990, at Dannenberger's office. St. Arnold asked J.A. to tell him what he had told Dannenberger at the counseling session on May 26. J.A. related that he and the defendant would go to the back of the store near the shoe chairs after the store was closed and engage in acts of mutual masturbation and oral sex. This usually occurred on Friday nights and had been taking place for about two years. J.A. demonstrated some of these acts using anatomically correct dolls given to him by St. Arnold. On some occasions the defendant would use a handkerchief to wipe himself off, then take the handkerchief to a sink in the back of the store, rinse it out and hang it on a wire across the sink to dry. J.A. also stated that other sexual incidents had taken place at defendant's residence. According to St. Arnold, J.A. related these events in a narrative fashion and he was not asked leading questions. On cross-examination, St. Arnold admitted that while J.A. told him that the last incident of sexual activity occurred during the week before he was placed in a foster home on April 25, J.A. did not state specifically what happened during that last incident.

In addition to the testimony related above, St. Arnold also testified regarding the interview with defendant at his store and the statements defendant made with respect to kissing J.A.'s penis. This testimony was substantially the same as that given at the hearing on the motion to suppress, except that St. Arnold admitted that both he and the defendant raised their voices several times during the course of the questioning.

John Pate testified to an interview with J.A. at the Bureau County sheriff's department on May 31, 1990. St. Arnold and Janelle Beltramini were present along with Pate and J.A. According to Pate,

J.A. told how he and the defendant had engaged in sexual activity about once a week for the past two years. The details of the incidents were consistent with those given by J.A. at the interview with St. Arnold. J.A. also described the final incident of sexual activity which occurred in April and this description was consistent with that given by J.A. at trial. Pate's testimony regarding the statements made by the defendant during the interview at his store was consistent with that given at the suppression hearing. Both Pate and Beltramini testified that they did not think that a person standing outside the clothing store and looking in would be able to see someone lying down by the shoe chairs.

Clarence Taylor, a Princeton police officer, testified that J.A. had been reported missing by his parents on Friday, April 20, 1990, and that he found J.A. and returned him to the Andersons' home at 4:35 p.m. Taylor had picked up J.A. and returned him to his home on other occasions and J.A. had never complained of being abused. Lonnie Jones, J.A.'s fourth-grade teacher, also testified that J.A. had never complained of sexual abuse.

Defendant's wife, Mary Lou Anderson, testified that after J.A. was brought home by Officer Taylor on April 20, he was locked in his room until 9 or 10 that evening, by which time the defendant had returned home after closing the store. Mrs. Anderson also testified regarding the questioning of defendant at the clothing store on May 31. She called the store around 3 p.m. and learned that the defendant was being questioned about J.A.'s accusations. When she arrived at the store, she heard screaming and hollering and St. Arnold walked towards her, raised his fist, and told her to get out of the store. St. Arnold then went back to shouting and accusing the defendant of sexual attacks, and defendant tried to defend himself by shouting back. Mrs. Anderson was unable to use the phone to call an attorney because St. Arnold would not move or stop talking, so she went to a drug store to make the call. When she returned to the store, St. Arnold told her that defendant had confessed but she told him that she did not believe it. Mrs. Anderson denied that defendant had admitted to her that he had kissed J.A.'s penis or committed any sexual act with J.A.

Stanley Peterson, a friend of the Andersons, testified that he was in the store visiting with the Andersons on Friday, April 13, 1990, and that he left with them when they closed the store. Peterson was unsure if he was at the store on April 20, although he often stayed there on Friday nights until closing time and he had never witnessed any sexual abuse by the defendant.

Defendant testified regarding J.A.'s behavioral problems, including hitting and kicking his sisters, taking off his clothes and exposing himself to them, and his habit of running or staying away from home. Defendant's testimony concerning the questioning by the investigators at the store was substantially the same as he gave at the suppression hearing. He again denied admitting that he had kissed J.A.'s penis.

Robert Lautzenhiser testified, as he had at the suppression hearing, that when he entered the store on May 31 he saw the defendant and another man "nose-to-nose" talking in loud voices. On cross-examination Lautzenhiser stated that he did not see Beltramini in the store, but if she had been sitting down he wouldn't have seen her because the counters blocked the view of the shoe area.

Ilene Anderson (no relation to defendant) testified in rebuttal that she had seen the defendant and a little boy leaving the clothing store alone on Friday nights on two or three occasions over a three-month period. She had also seen them in the store when no one else was there. On those occasions J.A. appeared to be jolly and talkative, however, and not angry or upset.

Defendant's argument that he was not proved guilty beyond a reasonable doubt is primarily based on the following factors: (1) J.A. did not report the sexual abuse promptly; (2) J.A. denied being sexually abused when specifically asked by Dannenberger; (3) J.A. did not report it to the personnel at Zeller Mental Health Center; (4) neither Dannenberger nor Zeller diagnosed J.A. as suffering from ongoing sexual abuse; (5) J.A. expressed no fear of returning to the Andersons' home; (6) Peterson's testimony indicated that defendant and J.A. were only rarely alone on Friday nights; and (7) Lautzenhiser's description of the questioning of defendant at his store supported defendant's testimony and undermined the credibility of the testimony of the investigators.

■ When presented with a challenge to the sufficiency of the evidence, the relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Wheeler* (1991), 216 Ill. App. 3d 609, 575 N.E.2d 1326.) With respect to J.A.'s reluctance to disclose the sexual abuse and the resultant inability of Dannenberger and the Zeller Mental Health Center to discover it, we note that the failure of a young victim of sexual abuse to make a prompt complaint is understandable given the child's natural sense of shame, fear, guilt and embarrassment. (*Wheeler*, 216 Ill. App. 3d 609, 575 N.E.2d 1326; *People*

*v. Lybarger* (1990), 198 Ill. App. 3d 700, 555 N.E.2d 1264.) Moreover, J.A. testified that he did not tell anyone about the abuse because he was afraid that defendant would hurt him. While J.A.'s apparent willingness to return to the Andersons' home could be viewed as inconsistent with his claim of sexual abuse, it is the jury's function to assess the credibility of the witnesses and the weight to be given their testimony, and minor inconsistencies do not in themselves create a reasonable doubt (*People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402; *People v. Escobedo* (1986), 151 Ill. App. 3d 69, 502 N.E.2d 1263). Similarly, to the extent that the testimony of Peterson or Lautzenhiser conflicted with that of the other witnesses, the resolution of such conflicts is the province of the trier of fact, which is in a superior position to determine the witnesses' credibility (*Wheeler*, 216 Ill. App. 3d 609, 575 N.E.2d 1326). Given the detailed, straightforward and convincing testimony of J.A., along with the purported admissions by defendant to the investigators, we find that there was ample evidence to support the jury's conclusion that defendant was guilty beyond a reasonable doubt.

Defendant next contends that the trial court erred in admitting testimony of sexual misconduct between the defendant and J.A. which was not charged in the indictment. Prior to trial, defendant filed a motion *in limine* seeking to exclude evidence of uncharged sexual misconduct, which was denied. Specifically, defendant argues that J.A. should not have been allowed to state that the defendant had been sexually abusing him almost every Friday night for two years. Defendant claims that the prejudicial effect of this evidence outweighed its probative value and that the repetition of this evidence by Dannenberger, St. Arnold and Pate was fundamentally unfair and resulted in a denial of due process. We disagree.

██ Although evidence of other crimes is not admissible merely to show a defendant's propensity to commit crimes, it is admissible when relevant for some other purpose such as to prove knowledge, intent, motive, absence of mistake or *modus operandi*. (*People v. Lear* (1991), 143 Ill. 2d 138, 572 N.E.2d 876; *People v. Brown* (1991), 214 Ill. App. 3d 836, 574 N.E.2d 190.) Furthermore, it is well established that in sexual offense cases evidence of a defendant's prior sexual activity with the same child is admissible to show the defendant's intent, design or course of conduct and to corroborate the victim's testimony concerning the charged offense. (*People v. Foster* (1990), 195 Ill. App. 3d 926, 552 N.E.2d 1112; *People v. Tannahill* (1987), 152 Ill. App. 3d 882, 504 N.E.2d 1283.) Limiting the complainant's testimony to a single incident would make the incident appear isolated and would place

an unfair strain on the credibility of the complainant's testimony. (*Tannahill*, 152 Ill. App. 3d 882, 504 N.E.2d 1283.) We find no error.

We also find defendant's argument that he was denied a fair trial by the repetition of J.A.'s statements by three witnesses to be unavailing. Dannenberger, St. Arnold and Pate testified pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10), which permits testimony of out-of-court statements by victims of sexual offenses who are under 13 years of age. As the court explained in *People v. Branch* (1987), 158 Ill. App. 3d 338, 340-41, 511 N.E.2d 872, 873-74:

> "The legislature by enacting section 115—10 obviously determined that a corroborative complaint is sufficiently reliable to enjoy an exemption from the rule against hearsay evidence. [Citation.] A second or third complaint is no less reliable or credible. True, there is opportunity for exaggeration or embellishment the longer the time between the incident and each successive complaint. This factor is remedied though through cross-examination (and possible impeachment of the victim from prior inconsistent statements). [Citations.] Once the victim testifies and is subject to cross-examination, the rationale for the rule against hearsay virtually disappears. [Citations.]
>
> Youthful victims often suffer an inability to articulate on the witness stand or lack credibility in general. Their complaints obviously become more credible, reliable and understandable when supported by corroborative complaint testimony from adults. Those who are close to the victim or who have interviewed the victim and investigated the alleged incidents should not be curtailed from testifying and aiding the victim merely because of their numbers or order of talking with the victim."

Assuming, for the purpose of resolving this issue, that the testimony of Dannenberger, St. Arnold and Pate was admissible under section 115—10 or some other exception to the hearsay rule, we generally agree with the *Branch* court and find its analysis dispositive of defendant's argument in this case. However, we caution that in some future case where the evidence is more closely balanced we would not hesitate to grant a defendant a new trial if it appears that the delicate scales of justice have been unfairly tilted by the sheer weight of repetition. We trust in the sound discretion of the trial courts to maintain the proper balance by limiting evidence which is unnecessarily cumulative.

Defendant next maintains that the court erred in admitting the testimony of Dannenberger, St. Arnold and Pate regarding J.A.'s

statements under section 115—10 because: (1) J.A.'s complaint of sexual abuse was not promptly made and was therefore unreliable; (2) the statements J.A. made to St. Arnold and Pate were not "complaints"; and (3) the statements by J.A. concerning uncharged misconduct did not come within the statutory exception.

Section 115—10 provides in relevant part:

"§115—10. (a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such an act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115—10.

■ Defendant argues that because J.A. did not complain of sexual abuse until a month after he left the Andersons' home and because he had denied any sexual abuse when interviewed by Dannenberger more than 20 times over the course of a year, his statements were unreliable. Section 115—10 does not codify the common law prompt complaint rule, and any evidence of delay in making the complaint affects the weight rather than the admissibility of the evidence. (*People v. Kelly* (1989), 185 Ill. App. 3d 43, 540 N.E.2d 1125; *People v. Bailey* (1988), 177 Ill. App. 3d 679, 532 N.E.2d 587; *People v. Cregar* (1988), 172 Ill. App. 3d 807, 526 N.E.2d 1376.) Here the trial court conducted the hearing required by section 115—10(b)(1) and found that the time, content and circumstances of J.A.'s statements provided sufficient safeguards of reliability. We find no error.

Defendant also contends that J.A.'s statements to St. Arnold and Pate were not "complaints" within the meaning of section 115—10 but were simply repetitions of the statements made to Dannenberger in response to the questions of the interviewers. However, the fact that the victim's complaint was made in response to questions does not render it inadmissible under section 115—10. (*People v. Morton* (1989), 188 Ill. App. 3d 95, 543 N.E.2d 1366; *Kelly*, 185 Ill. App. 3d 43, 540 N.E.2d 1125; *Branch*, 158 Ill. App. 3d 338, 511 N.E.2d 872; *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019.) This section "is applicable only when the declarant is a child, and the focus is on the fact a child would be unlikely to fabricate rather than that the declarant would be likely to be truthful only if the information is volunteered." (*Morton*, 188 Ill. App. 3d at 104, 543 N.E.2d at 1372.) The testimony of St. Arnold and Pate concerning J.A.'s statements was admissible notwithstanding that those statements were the result of questioning.

■ The defendant's last contention with regard to section 115—10 is that any testimony by Dannenberger, St. Arnold and Pate concerning J.A.'s account of uncharged sexual conduct by defendant was not within the statutory hearsay exception. Defendant focuses on the language contained in section 115—10 (a)(2), which permits testimony of hearsay statements made by the child "describing any complaint of *such act* or matter or detail pertaining *to any act which is an element of an offense which is the subject of a prosecution* for a sexual act perpetrated upon a child." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) Defendant argues that the emphasized language indicates that only statements which relate to the charged offense are admissible hearsay evidence under the statute. Therefore, statements regarding other acts, which are not the subject of a prosecution, are inadmissible under the general rule excluding hearsay statements. Defendant notes that each of the three witnesses related J.A.'s claims of sexual abuse occurring over a two-year period, rather than simply recounting the single incident in April of 1990 which was charged. Defendant thus maintains that any statements of uncharged misconduct should have been excluded as hearsay which did not fall within the exception carved out by section 115—10. We find this argument persuasive.

The testimony of Dannenberger, St. Arnold and Pate was clearly hearsay since it consisted of J.A.'s out-of-court statements and was used to show the truth of the matters asserted therein (see *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738). While section 115—10 creates an exception to the hearsay rule, it does not abrogate the

rule nor remove its effect other than in the area of the exception. The plain language of the statute limits the exception to complaints of, or details about, sexual acts which are the subject of a prosecution. While we believe that section 115—10 is broad enough to encompass *some* matters other than the sexual acts upon which the charge is based (see *People v. Rushing* (1989), 192 Ill. App. 3d 444, 548 N.E.2d 788 (hearsay testimony that defendant threatened to kill victim's family if she told of sexual assault was admissible where it was spoken contemporaneously with the sexual acts)), to hold that testimony of uncharged misconduct spanning a two-year period falls within the statutory exception would distort the language of the statute beyond recognition. We hold, therefore, that such testimony should not have been admitted. However, the admission of impermissible details may be deemed harmless error when it is substantially corroborated by the testimony of the complainant or by other competent evidence and the complainant is present in court and available for cross-examination. (*People v. Laremont* (1988), 174 Ill. App. 3d 201, 528 N.E.2d 249; *Branch*, 158 Ill. App. 3d 338, 511 N.E.2d 872; *Server*, 148 Ill. App. 3d 888, 499 N.E.2d 1019.) In this case J.A.'s testimony with regard to uncharged acts of sexual misconduct and the ongoing nature of the sexual abuse paralleled that related by Dannenberger, St. Arnold and Pate. While the repetition of this evidence may have had some prejudicial effect, we do not believe it affected the outcome of defendant's trial given the substantial evidence of guilt. (See *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612 (a conviction will not be reversed where it does not appear that justice has been denied or that a finding of guilt resulted from an error).) This evidence included not only J.A.'s detailed testimony, but also the highly inculpatory admissions purportedly made by defendant in the presence of two witnesses. After considering the entire record, we find that the admission of the improper hearsay testimony was harmless error.

## SENTENCING

Defendant's final contention is that his sentence of 15 years of imprisonment was excessive and arbitrary. Defendant points to his age, poor health and the fact that his children have been removed from his home as factors to indicate it is unlikely that he would pose any threat in the future. Defendant points out that he has no history of prior criminal activity and has led a law-abiding life. Defendant complains that the trial court failed to refer to these mitigating circumstances prior to imposing sentence and also notes that the court did not explicitly mention any statutory aggravating factors.

■ The trial court is charged with the task of fashioning a sentence which strikes the appropriate balance between protection of society and rehabilitation of defendant (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541) and that determination will not be disturbed absent an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882). The court is not obligated to recite and assign value to each fact presented at a sentencing hearing. (*People v. Meeks* (1980), 81 Ill. 2d 524, 411 N.E.2d 9; *People v. Goodman* (1983), 116 Ill. App. 3d 125, 451 N.E.2d 607.) It is presumed that the court considered any mitigating evidence absent some indication, other than the sentence itself, to the contrary. (*People v. Sawyer* (1985), 139 Ill. App. 3d 383, 487 N.E.2d 662, *aff'd* (1986), 115 Ill. 2d 184, 503 N.E.2d 331.) Prior to sentencing the defendant, the trial court made reference to the impact of the offense on the victim, deterrence, defendant's potential for rehabilitation and defendant's "exemplary record in public service." It is clear from the court's comments that it weighed and considered both the mitigating and aggravating factors, and we will not substitute our judgment for that of the trial court. *Cox*, 82 Ill. 2d at 280, 412 N.E.2d at 547.

Defendant also contends that the trial court erred in determining his sentence based on the sentencing decision in a prior unrelated case in which another defendant pleaded guilty. Our review of the record does not support defendant's position. After first noting the defendant's right to maintain his innocence even after conviction, the court went on to explain that it could consider in some situations the fact that a defendant had pleaded guilty and shown remorse. The court referred to a prior case in which the defendant pleaded guilty and the victim and family members testified in defendant's behalf and where that defendant received a 15-year sentence. After discussing the impact of the present defendant's crime on the victim and the negative impact that the defendant's failure to admit to a problem might have on the success of counseling, the court stated that it was considering the defendant's exemplary record in public service as a mitigating factor. The court then stated:

"[M]aybe that offsets the mitigation that I show that [the defendant in the prior case] pleaded guilty. That is the closest I can come in an effort to be even handed in these matters."

Although a defendant may not be punished for exercising his constitutional right to trial (*People v. Moriarty* (1962), 25 Ill. 2d 565, 185 N.E.2d 688; *People v. Byrd* (1986), 139 Ill. App. 3d 859, 487 N.E.2d 1275), a sentencing court may grant concessions or show leniency to a defendant who assumes responsibility for his conduct by pleading

guilty (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Sanchez* (1989), 189 Ill. App. 3d 1011, 546 N.E.2d 268). In addition, a court may consider the defendant's lack of remorse or denial of guilt as it affects his prospects for rehabilitation. *Ward*, 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Avila* (1989), 180 Ill. App. 3d 345, 535 N.E.2d 1027.

It appears from the court's comments that it considered the defendant's participation in the Elk's club and community service projects to be a mitigating factor equivalent to the remorse shown by the defendant in the prior case. In other words, the trial court viewed the defendant's service to the community as warranting the same leniency shown to a defendant in an unrelated but similar case. While sentencing is an individualized proceeding which should be based on the particular circumstances of each case, a trial judge is not required to ignore his experience and create a *tabula rasa* before each sentencing determination is made. We find nothing improper in the court's earnest "effort to be even handed."

For the reasons stated above, the judgment and sentence of the circuit court are affirmed.

Affirmed.

BARRY, P.J., and GORMAN, J., concur.