THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES WILSON, Defendant-Appellant.
Fourth District   No. 4—92—0218

Opinion filed June 29, 1993.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Vince Moreth, State's Attorney, of Carlinville (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In September 1991, a jury found defendant, James Wilson, guilty of one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(2)) and one count of aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, par. 12—16(c)(1)(i)) as to C.J., who was 4½ years old in October 1990 when these crimes were committed. The jury also found defendant guilty of a second count of aggravated criminal sexual abuse as to his own child, A.J., who was eight years old in October 1990 when that crime was committed. The trial court later sentenced defendant to nine years in prison for the aggravated criminal sexual assault conviction and ordered defendant to serve that sentence consecutively to concurrent three-year prison terms the court imposed for the two aggravated criminal sexual abuse convictions.

Defendant appeals, making the following arguments: (1) the trial court improperly admitted hearsay statements that the State offered pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—10); (2) the court erred by admitting hearsay statements of the child complainant made to the State's Attorney without considering their admissibility under section 115—10 of the Code; (3) the court erred by admitting evidence of defendant's committing other criminal acts upon C.J.; (4) the court abused its discretion by not allowing expert testimony "concerning the unique problems associated with children of tender years in recounting instances of abuse and the problems associated with interviews by authorities"; and (5) the court erred by not conducting a hearing to determine whether one juror was "coerced" into convicting defendant.

We affirm.

## I. BACKGROUND

Around October 1988, C.J. (born January 22, 1986) and her parents, Susan and Bart Jones, moved next door to the house occupied by defendant and his family, including A.J. C.J. was no relation to defendant or anyone in his family. A.J. (born October 17, 1982) lived with Sue Wilson (her mother), defendant (her stepfather), and J.W. (her younger half brother and the son of defendant and Sue Wilson). Prior to and in October 1990, C.J. and A.J. often played together. Their parents also frequently sat outside at night and talked.

Defendant worked nights and stayed home during the day. On October 8, 1990, a school holiday (Columbus Day), A.J. asked C.J. to come over to her house to play. Mrs. Jones knew defendant would supervise them, so she allowed C.J. to do so, telling her to return home when A.J.'s mother got home for supper. When C.J. returned at around 5 p.m., Mrs. Jones noticed that she acted withdrawn and quiet. She asked C.J. if she had fun, and C.J. responded by shrugging her shoulders and saying, "I guess." C.J. usually came home excited after she played with a friend, so Mrs. Jones asked her if anything was wrong. C.J. shook her head, and her mother continued to prepare supper.

However, C.J. still stayed next to her mother in the kitchen. Mrs. Jones asked several more questions, and C.J. eventually responded that she could not say what troubled her because "[i]t was a secret." After further questioning, C.J. then responded that defendant would " 'whip her butt' " if she told. Despite Mrs. Jones' reassurances that defendant would not hurt her, C.J. insisted that he would.

Mrs. Jones then assumed that C.J. got in trouble and that defendant had punished her, so she asked if C.J. had broken something at defendant's house. C.J. responded, " 'It wasn't nothing like that.' " Only then did it dawn on Mrs. Jones that some sort of abuse might have occurred. She thus took C.J. up to Mrs. Jones' bedroom to talk. She asked C.J. if defendant did something wrong to her, and C.J. nodded that he had. After further questions, C.J. told her mother that "she had to take her pants off." Mrs. Jones asked where J.W. and A.J. were, and C.J. said that defendant had told J.W. to stay in his room and play, and that A.J. was in defendant's bedroom with C.J. and defendant. C.J. said that defendant closed the bedroom curtain because it faced the Jones' living room.

C.J. continued that A.J. also stood naked in the room and cried. C.J. said that defendant had rubbed C.J.'s legs and played with her "privates," indicating what she meant by pointing to her vagina. C.J. began to cry, started rubbing on her mouth, and told her mother that defendant forced her to put her mouth on his penis. She said that "it didn't taste good at all."

Based on this information, the Illinois Department of Children and Family Services (DCFS) became involved in the case. Two days later, October 10, 1990, the State charged defendant with the multiple counts of sex offenses of which the jury later convicted him.

When C.J. took the witness stand at defendant's trial, she initially did not want to testify about the events at issue. She first denied that anyone had ever touched her and then testified that she "forgot" that

anything she "did not like" happened in defendant's bedroom. Ultimately, however, when the prosecutor asked her if she had touched anyone, she testified that she had kissed defendant's "privates" because defendant had told her to do so. She said that this occurred in defendant's bedroom one day when she went to play at A.J.'s house. She added that when she did so, "[h]e told me to make it go up and down." She also testified that defendant had kissed her on her privates and that A.J. had watched as these events occurred. When asked what A.J. did at the time, she responded that A.J. cried "[b]ecause she didn't want to do it." Finally, she added that defendant "[t]old me that if I told anybody, *** he would spank my butt." C.J. testified that she had discussed these events with her mother and the prosecutor.

Over defense counsel's repeated objections, C.J. also testified about another time when she went over to play with J.W. when A.J. was not home. She testified that, while she wore only her shirt, she kissed defendant "[o]n the private" and he kissed her "on the privates" in defendant's bedroom. She added that when she kissed defendant's privates, defendant again told her to "make [her] head go up and down." After she finished, defendant then told her, "if I told anybody, he'd spank my butt."

A.J. also had problems testifying. A.J. initially testified that she and C.J. almost never played together, saying that C.J. came over to play "[m]aybe a couple" of times. A.J. said that she went to play at C.J.'s house only once. When the prosecutor asked her if she could tell the jury what happened when C.J. came over to play, she first said that she forgot, and then said that she did not know if she could tell what happened.

A.J. eventually testified that she saw C.J. kiss defendant but refused to say where. When the prosecutor asked A.J. if C.J. kissed defendant on his privates, A.J. did not say or do anything in response. The court encouraged A.J. to tell the truth, but A.J. continued to remain mute when asked any question pertaining to sexual contact. She explained that she did not want to say where defendant touched her.

The prosecutor then suggested that she write the answer down, which she agreed to do. Over defense counsel's objection, she wrote the words "the privates" on a piece of paper. When asked whether she wrote the truth or just something she did not want to say, she responded that it was the truth. However, she still did not want the prosecutor to tell the jury what she wrote. Finally, the prosecutor got her to answer affirmatively that defendant had touched both C.J. and

her, that the touching involved kissing, and that the kissing involved what she wrote on the piece of paper: "the privates."

On cross-examination, defense counsel asked her if she ever told Barry Beagles (a DCFS worker) what happened, and she responded, "No." Defense counsel then asked her if Beagles had ever asked her several leading questions like the prosecutor had just done, and she said, "Yes." She testified that she got tired of Beagles asking so many questions. She also said that she never told her mother that defendant had touched her private parts. On redirect, A.J. testified that she wrote the truth down on the paper. She also testified that she did not want to be alone in a house with defendant ever again.

Susan Jones then testified about statements C.J. made to her describing what happened to C.J. and A.J. Mrs. Jones testified about the night in question and to the events regarding how she learned about defendant's behavior toward C.J. and A.J. The prosecutor also asked Mrs. Jones about a day in the summer of 1990 when C.J. went to defendant's house to play with two-year-old J.W. when A.J. was not home. Mrs. Jones remembered the one occasion because C.J. had not previously or subsequently gone over to defendant's house when A.J. was not home.

Mrs. Wilson then testified as a defense witness that she and defendant had a normal family life. She said that C.J. played at their house almost every day for hours at a time.

Regarding October 8, 1990, Mrs. Wilson testified that she came home around 5:15 p.m. and watched C.J. and A.J. play until around 6 p.m. when she told C.J. it was time to go home. She watched A.J. walk C.J. home and Mrs. Jones open the door for C.J. to let her inside. Mrs. Wilson testified that she noticed nothing unusual, that the children were fully dressed as usual, and that both A.J. and C.J. made no complaints to her. Mrs. Wilson added that she and Mrs. Jones spoke later that evening, and that Mrs. Jones told Mrs. Wilson that C.J. felt "uncomfortable" because she had come home "crying, [and was] red in the face when she [came] home." However, Mrs. Jones did not mention anything about any sexual abuse.

The next day, Mrs. Wilson dropped A.J. off at the baby-sitter's when she went to work. When she returned after work, the baby-sitter brought her inside to meet Beagles, a DCFS employee, who then held A.J. in his arms. Beagles informed Mrs. Wilson why he was there. Mrs. Wilson testified that Beagles then wanted to speak to her son, so "[h]e took my son by the hand and drug [sic] him through a small hallway, [while] my son was screaming."

Mrs. Wilson testified that A.J. had denied to her that "something" had happened. Mrs. Wilson also testified that A.J. had told her that she had lied to the State's Attorney during a meeting "because the State's Attorney wouldn't leave her alone and she was scared."

Defendant testified next and denied that he touched either A.J. or C.J. in the vaginal area on October 8, 1990. He also denied that he forced C.J. to kiss his penis.

## II. ANALYSIS

### A. *The Testimony of the Child-Declarant at the Section 115—10 Hearing*

■ Defendant first argues that the trial court improperly admitted the hearsay testimony of Susan Jones and Barry Beagles about what C.J. and A.J. had told them because the State neither called C.J. and A.J. to testify at the section 115—10 hearing nor proved them to be unavailable. In *People v. Back* (1992), 239 Ill. App. 3d 44, 53-54, 605 N.E.2d 689, 696, this court addressed the same argument and wrote the following:

"Defendant's argument is grounded in the presumption [that] the 'proceeding' referred to in section 115—10(b)(2)(A) means the reliability hearing. [Citation.] According to defendant, the child victim must testify at this hearing unless he or she is unavailable. Defendant directs us to no legal support for this contention. A review of Illinois case law reveals no instances when the child was required to testify at both the reliability hearing and the trial.

We reject defendant's interpretation of 'proceeding.' 'Proceeding,' as contemplated by the legislature, and evident from the purpose of the reliability hearing, refers to trial proceedings, not the reliability hearing. The reliability hearing focuses on the timing, content and circumstances when the child victim made the statements. The child's testimony at the reliability hearing is not necessary to enable the trial judge to evaluate whether there were sufficient safeguards of reliability when the statements were made."

We abide by our holding in *Back* and accordingly reject defendant's argument that C.J. and A.J. needed to testify at the reliability hearing if the State did not prove them unavailable.

### B. *Hearsay Statements of the Child Victim*

Defendant does not challenge the trial court's findings that the

time, content, and circumstances of the statements of C.J. and A.J. about the events in question contained sufficient safeguards of reliability. Instead, defendant argues that the prosecutor elicited testimony from A.J. about what she had said to the prosecutor before trial without first submitting those statements for a determination of their admission at the section 115—10 reliability hearing.

As described above, A.J. had difficulty testifying at trial. As one means of trying to elicit A.J.'s testimony, the prosecutor asked her if she remembered what she had told him in a previous meeting between her (A.J.), C.J., and the prosecutor. Defendant complains of the following four colloquies between the prosecutor and A.J.:

"[(1)] [State's Attorney]: [A.J.], [do] you remember when you and [C.J.] talked in my office?

A. Yeah.

Q. Can you tell me what happened that time when you and [C.J.] were over at your house with [defendant]?

A. (Pause.) (No response heard or seen.)

* * *

[(2)] Q. [A.J.], do you remember when you and [C.J.] were in my office and we talked?

A. Yeah.

Q. Okay. And do you know what we talked about? You remember, right?

A. (Nodding head.)

Q. You remember you told me about some things—well, let me ask you this. Did—did you see [C.J.] touch your step-dad ***?

A. Yes.

Q. What did you see [C.J.] do? Where did she touch him at?

A. (Pause.) (No response heard or seen.)

* * *

[(3)] Q. You remember—you remember when you and [C.J.] came down to my office that day?

A. Yeah.

Q. Okay. Now[,] did you ever see [C.J.] kiss [defendant] anywhere?

A. (Pause.) (No response heard or seen.)

Q. [A.J.]?

A. What?

Q. You remember what you told me when you were in my office?

A. Yeah.

Q. Okay. Did you tell me that you saw—
[Defense counsel]: Your Honor—
[Prosecutor]: —[C.J.] kiss [defendant]?
[Defense counsel]: —approach the bench, your Honor?
THE COURT: You may.

\* \* \*

[(4)] [Prosecutor]: I am going to make this simple. Do you remember what you told me in my office when you and [C.J.] were there?
A. Yeah.
Q. Okay. Can you tell us what you told me when you and [C.J.] were in the bedroom with [defendant]?
A. (Pause.) (No response heard or seen.)
Q. Did—did [defendant] ever touch you on any part of your body at all when you were in the room with [C.J.] and him?
A. Yes.

\* \* \*

Q. Do you remember where he touched you?
A. Yeah.
Q. Where was that?
A. (No response seen or heard.)"

■■ Several of the questions about which defendant complains merely ask A.J. what defendant did to her and what she saw him do to C.J. Thus, these questions do not call for a hearsay response, but for testimony about events that A.J. witnessed. In other questions, the prosecutor asked questions that called for a hearsay response, but for whatever reason, A.J. never answered them. We need not decide whether A.J.'s responses to these questions could have been properly received in evidence because she gave no response.

## C. *Evidence of Prior Bad Acts*

Defendant next argues that the trial court erred by allowing the State to introduce evidence of defendant's prior misconduct with C.J. In particular, the prosecutor elicited testimony from C.J. that the charged conduct in this case was not the only time that defendant had sexually abused her. She testified that he had done the same things to her on a previous occasion when A.J. was not home. Defendant emphasizes that the State provided no corroboration of this prior incident and that C.J. claimed this prior incident occurred "when it was cold outside," while her mother testified that the only time C.J. went to defendant's house without A.J.'s being there was during the summer.

■ In sex offense cases involving child victims, evidence of prior sexual acts between the defendant and the child victim is admissible to show intent, design, course of conduct, the intimate relationship between the parties, or to corroborate the victim's testimony regarding the charged offense. (*People v. Anderson* (1992), 225 Ill. App. 3d 636, 647, 587 N.E.2d 1050, 1059; *People v. Diaz* (1990), 201 Ill. App. 3d 830, 837, 558 N.E.2d 1363, 1367.) In this case, C.J. testified about prior sexual acts between her and defendant. For the reasons stated in *Anderson* and *Diaz*, the trial court did not err in allowing testimony about them into evidence.

### D. *Expert Testimony About a Child Victim's Credibility*

Defendant next argues that the trial court erred by not allowing a defense expert psychiatrist to testify about the problems that child victims of sex abuse have remembering and describing these incidents. In support of this argument, defense counsel tendered a *Time* magazine article to the trial court that reports about child victims' purported proclivity to make these allegations only to please investigators and parents who, intentionally or unintentionally, subtly suggest what the child should say. We reject defendant's argument and emphatically disagree that the trial court abused its discretion by not permitting this testimony.

■ A trial court should allow expert testimony only if (1) the proffered expert has knowledge and qualifications uncommon to laypersons that distinguishes him as an expert; (2) the expert's testimony would help the jury understand an aspect of the evidence that it otherwise might not understand, without invading the province of the jury to determine credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles. (See *People v. Enis* (1990), 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164; *People v. Eyler* (1989), 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285, citing *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, 1014.) In the present case, we hold that the proffered testimony (1) would not have provided the jury with much—if any—information beyond the knowledge of an average layperson, and (2) would have severely impinged on the province of the jury to determine credibility and assess the facts of the case.

In a hearing on defendant's offer of proof conducted prior to trial, Dr. Michael B. Schwartz of the department of psychiatry of Southern Illinois University in Springfield testified about the limitations child victims have recalling alleged instances of abuse. Dr. Schwartz testified regarding his findings in studies about how the limited cognitive

ability of child victims taints their recollection of events. Defendant claims that Dr. Schwartz would have informed the jury that "based on his 25 years of experience in child psychiatry[,] *** wherever there is an allegation of sexual abuse [upon a child victim], it is imperative to establish an appreciation of the cognitive development of the child, their [sic] ability or tendency to engage in fantasy, and their [sic] ability to differentiate between fantasy or reality."

In refusing to allow defendant's expert to testify, the trial court noted that the expert testimony would unduly emphasize the children's testimony at trial, would reveal only general information about children as opposed to information about the child victims in this case, and would only provide common knowledge that defendant could argue to the jury without the aid of an expert. We agree. The limited cognitive abilities of children are well known, and any jury can be expected to take that factor into account when determining a child's credibility. The proffered expert testimony on this point would have provided no useful information to the jury.

The supreme court in *Enis* addressed a similar situation when the defendant in that case offered an expert to testify about the reliability of eyewitness testimony. Although the court noted that much of the expert's testimony would have resolved purported "myths" about eyewitness testimony that were not pertinent to that case, the court wrote the following:

"We caution against the overuse of expert testimony. Such testimony, in this case concerning the unreliability of eyewitness testimony, could well lead to the use of expert testimony concerning the unreliability of other types of testimony and, eventually, to the use of experts to testify as to the unreliability of expert testimony. So-called experts can usually be obtained to support most any position. The determination of a lawsuit should not depend upon which side can present the most or the most convincing expert witnesses. We are concerned with the reliability of eyewitness expert testimony [citations], whether and to what degree it can aid the jury, and if it is necessary in light of defendant's ability to cross-examine eyewitnesses. An expert's opinion concerning the unreliability of eyewitness testimony is based on statistical averages. The eyewitness in a particular case may well not fit within the spectrum of these averages. It would be [inappropriate] for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable." *Enis*, 139 Ill. 2d at 289-90, 564 N.E.2d at 1165.

The above analysis regarding expert testimony about eyewitness testimony also applies to expert testimony about child victims' allegedly poor memories and proclivities to invent accusations to please their elders. Indeed, we view defendant's argument in this case as much weaker than the defendant's argument in *Enis*. Here, the testimony of the psychiatrist would have provided nothing more than generalizations—of dubious authenticity—that would have nothing to do with the credibility of A.J. and C.J. Dr. Schwartz would have provided only stereotyped generalizations regarding child victims.

We agree with the decisions of the courts of other States that have considered and rejected similar arguments. (See *State v. Erickson* (Minn. Ct. App. 1990), 454 N.W.2d 624, 628; *State v. James* (1989), 211 Conn. 555, 575, 560 A.2d 426, 437.) Thus, we hold that the trial court did not abuse its discretion in rejecting the proffered expert testimony concerning the reliability of child-victim testimony.

## E. *Juror Intimidation*

Defendant last argues that the trial court erred by failing to conduct a hearing to determine whether one juror "coerced" another juror into voting "guilty" by misinforming that juror about the effect of a "not guilty" verdict. After defendant's trial, a juror contacted defense counsel because she feared that the jury verdict was improper. She informed defense counsel that another juror advised her that "if she persisted in her vote of not guilty, the Defendant would be set free and would never stand trial for the charges, and that it would be her responsibility if [defendant again committed] a similar [offense]." Defense counsel added that the juror claimed this "misinformation" swayed her to vote "guilty." The trial court denied defendant's motion to conduct a hearing about this purported coercion.

■■ A juror may not impeach a jury's verdict by subsequently providing an affidavit or testimony which shows the motive, method, or process by which the jury reached its verdict. (*People v. Boclair* (1989), 129 Ill. 2d 458, 485, 544 N.E.2d 715, 727.) Accordingly, evidence regarding a juror's reasoning or what persuaded a juror to vote as he did is inadmissible. (*People v. Tucker* (1990), 193 Ill. App. 3d 849, 857, 550 N.E.2d 581, 586.) The only way to impeach a jury's verdict is to reveal physical intimidation (see *People v. Reid* (1991), 221 Ill. App. 3d 695, 699, 583 N.E.2d 1, 4) or excluded events brought to the jury's attention *without* showing how these events affected the jury's reasoning (*Tucker,* 193 Ill. App. 3d at 857, 550 N.E.2d at 586). In this case, the information provided by the juror pertains to what influenced her decision making. Therefore, because it could not impeach

 323

the jury's verdict even if true, the trial court correctly denied defendant's motion without conducting a hearing thereon.

### III. CONCLUSION
For the reasons stated, we affirm the judgment of the trial court.

Affirmed.

KNECHT and GREEN, JJ., concur.