THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FREDERICK L. JAHN, Defendant-Appellant.

Second District    No. 2—91—0996

Opinion filed June 28, 1993.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel A. Fish, State's Attorney, of Dixon, and Samuel J. Cahnman, of Springfield (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

On July 18, 1991, following a jury trial defendant, Frederick L. Jahn, was found guilty of committing aggravated criminal sexual abuse by intentionally touching the vaginal area of R.R. for purposes of sexual arousal; the complaining victim was five years old at the time of the offense (see Ill. Rev. Stat. 1989, ch. 38, par. 12—16(c)(1)(i)). Following the denial of his post-trial motion, defendant was sentenced to 10 years' imprisonment, and he timely appealed.

On appeal, defendant argues (1) that he was denied a fair trial because the trial court admitted into evidence allegedly unreliable and prejudicial out-of-court statements made by the minor victim to a police sergeant and a therapist contrary to the statutory exception to the hearsay rule (Ill. Rev. Stat. 1989, ch. 38, par. 115—10); (2) that despite defendant's failure to object, the therapist's testimony regarding the victim's statement to him that sexual abuse had taken place over a period of time should not have been heard by the jury because it lacked probative value and was very prejudicial; and (3) that he was denied a fair trial when the prosecutor stated in closing argument that the victim had identified defendant in a pretrial photographic

lineup when she had not actually identified defendant from a photograph according to the police officer's testimony. We affirm.

## RELIABILITY HEARINGS

The record reveals that, at a hearing on June 18, 1991, the trial court found R.R., the six-year-old victim, competent to testify at trial, but no ruling was then made regarding the competency of her younger sister A.R. to testify. Defendant filed a motion *in limine* on July 9, 1991, to prevent testimony regarding certain statements made by A.R. and by R.R.'s mother Rosemary, concerning defendant. The motion was granted on July 16, 1991.

Pursuant to the requirements of section 115—10 of the Code of Criminal Procedure of 1963 (Code), defendant also sought to exclude out-of-court statements made by R.R. for lack of reliability. In a prosecution for sexual acts perpetrated upon a child under age 13 as defined by the statute, under the conditions stated in pertinent part here, section 115—10 of the Code permits the following to be admitted as an exception to the hearsay rule:

"(1) [T]estimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115—10.

R.R. had made statements to Detective Sergeant Keane Hudson in a telephone call on February 5, 1991, and in conferences held on February 6 and 7, 1991, at the Lee County State's Attorney's office; to Sergeant Michael Koppien in an interview at the Phelps residence on December 10, 1990; to her mother Rosemary in conversations on December 25 or 26, 1990, and February 4, 1991; and to her therapist, Jerry Fox, on or after February 8, 1991.

A reliability hearing pursuant to section 115—10 was held on July 12, 1991, regarding statements R.R. made about the alleged sexual conduct of defendant. Rosemary testified that she noticed bizarre behavior by the victim's younger sister A.R. in September or October 1990. A.R. told her that she had a boyfriend named "Johnny Kelker." R.R. also began talking about Johnny Kelker in November. R.R. told her mother Rosemary on December 25 during a trip back to the hospital that she had to tell her mother something. R.R. said Johnny Kelker was the defendant, Fred Jahn. Defendant was Rosemary's cousin. R.R. told her mother that Fred did bad things to her. Fred made A.R. and R.R. go into his bedroom where A.R. had to lie on the bed and R.R. had to stand at the end of the bed and watch A.R. "suck Fred's worm" and then Fred "sucked her woochie." These were terms the children used to describe sexual organs. R.R. also said that Fred had touched her "woochie." When Rosemary asked if he had put anything inside her "woochie," R.R. said no and then did not want to talk further about the subject.

Rosemary testified that she had gone to Oakwood Hospital, a psychiatric hospital in Rockford, on the day after Thanksgiving because of emotional stress related to the suspected sexual abuse, and she was released in February 1991. In October she had noticed that A.R. started acting oddly and began talking about her boyfriend, Johnny Kelker. Examples of her odd behavior included her trying to stick a knife up inside herself and playing with the dog's penis.

In a telephone conversation from the Oakwood Hospital on December 26, when Rosemary asked if R.R. had identified Fred in the police station photographs, R.R. said she thought one of the pictures was Fred's, but she did not identify Fred because she was scared since Fred had done bad things to her. In a February 4, 1991, conversation, R.R. told Rosemary that she was riding her bicycle three or four days before and Fred had stopped and talked to her on the highway. Fred asked her to come to his house and "do bad things." Rosemary then called the police to report the incident.

Rosemary was present at an interview on February 6 in the State's Attorney's office. Also present were Susan Swegle, Keane Hudson, and Dan Fish. At that interview, R.R. said that Fred had A.R. lie down on his bed and R.R. had to stand at the end of the bed to watch A.R. suck Fred's "worm," and Fred sucked A.R.'s "woochie." R.R. said that Fred was the same person as Johnny Kelker. Fred also put his hands down R.R.'s shorts inside her underwear and touched her "woochie" with his finger, and it hurt her. R.R. told him to stop, but he did not. This incident occurred sometime before the

Fourth of July when R.R. was wearing her "flash" shorts, which were fluorescent green and pink. Rosemary believed that R.R. was telling the truth. Rosemary was cross-examined particularly regarding the various dates of the incidents.

Sergeant Koppien of the Lee County sheriff's department testified that he was involved in the investigation of defendant and, on November 26, he showed R.R. a photographic lineup. She did not identify Johnny Kelker's picture in the lineup but indicated that Johnny Kelker was the one who committed the sexual abuse.

On December 10, 1990, Koppien interviewed R.R. at 10 p.m. at her grandfather's residence in Lee Center, Illinois. Koppien learned that Fred Jahn used the name Johnny Kelker. R.R. said that Johnny Kelker had taken her outside and pulled her pants down. When asked who did this, she named Fred. She told Koppien that Kelker made her sister A.R. go into his room and he pulled her pants down. When Koppien asked R.R. whether the person who took her clothes off was the same as the one who took A.R.'s clothes off, R.R. replied affirmatively. R.R. initially denied that Kelker touched her, but said she had seen him touch A.R. and pointed to her vaginal area. Koppien terminated the 30- to 45-minute interview because R.R. became tired. In response to the court's inquiry, Koppien opined that defendant gave the name Johnny Kelker to the girls to confuse them.

Detective Sergeant Keane Hudson testified that he received a telephone call from R.R.'s mother on February 5, 1991, during which he spoke to R.R. Defendant was R.R.'s cousin. R.R. said she was on her bicycle when defendant approached her in his car and asked her to go to his house to "do bad things." Present at the February 6 interview in the State's Attorney's office were Hudson, State's Attorney Fish, victim witness coordinator Susan Swegle, and R.R. Hudson did the questioning, and the others listened. In response to Hudson's questions, R.R. stated that Johnny Kelker was the defendant, Fred Jahn. Fred was her cousin. Asked whether her Uncle Fred had touched her, she said it was not Uncle Fred but "little" Fred who did bad things. Defendant lived with his parents, Fred and Betty Jahn. R.R. referred to defendant as Fred and to his father as Uncle Fred.

R.R. related an incident which took place last summer before she turned six years old. She was with Fred and A.R. Fred's mother had gone to Woodhaven Lakes to pick up his father. In his bedroom, Fred placed R.R. and her sister on the bed and lay on top of them. R.R. said that Fred touched her "private area" with his hand and pointed to her vaginal area. Fred had placed his hands in her shorts under her underwear and on her private area. She said it hurt and she told Fred

to stop, but he continued touching her. R.R. said this occurred prior to her mother's birthday which is on July 6; her mother had taken her father to a doctor's appointment. Hudson obtained the family's medical records and determined the date as June 19. R.R. said she was wearing her neon "flash" shorts at the time of the incident. The interviews were conducted on February 6 and 7, and Hudson found no inconsistencies in R.R.'s statements. On February 7, Assistant State's Attorney Tom Murray was present.

On cross-examination, Hudson said that the investigation began in October 1990. Prior to the February conversations, R.R. had been questioned by representatives from the Department of Children and Family Services (DCFS). R.R. discussed the allegations with her mother and with Jerry Fox.

On redirect examination, Hudson stated that there was nothing about R.R.'s conduct which caused him to question her truthfulness.

Defense counsel argued that the statements were unreliable, that they were made a considerable time after the incidents and that they were not spontaneous and were made in structured interviews with a number of persons. Among other things, the State responded that the statutory exception did not require spontaneity, did not preclude structured interviews, and the time frame went to the weight of the testimony rather than its admissibility. The court continued the proceeding and researched the issue.

On July 16, the court decided to reserve its ruling on the admissibility of the statements until after the victim testified. The court would not admit the hearsay statements of A.R. and ruled that R.R.'s testimony would be confined to what happened to her alone, and not with respect to A.R.

Later, during the trial, after the victim testified, the court held another reliability hearing outside the presence of the jury in which Jerry Fox testified that he was a licensed clinical social worker who had been in private practice since 1983. R.R. was a client whom he saw initially on an outpatient basis on February 8, 1991. R.R. was later admitted to Oakwood Hospital, and Fox became her and the family's therapist. Fox used crayons and paper to have the victim express herself. She also talked about incidents between her and defendant. Although Fox knew of the allegations of sexual abuse, it was R.R. who brought up the topic on her own. Fox asked her to describe various happy and sad situations in her life and how she felt about them. She disclosed that she was sexually molested.

R.R. drew various pictures in which she showed herself as a small child with a very sad face. She drew a larger picture next to her rep-

resenting defendant who had his hand on her genital areas. She described what was going on in the picture, and she talked about digital penetration. She said it was painful and she wanted defendant to stop. She said he would not stop and she felt very frightened. She made references to her various body parts including her "woochie" and her "boobies."

R.R. also talked about her sister who was also abused in the same room. The sexual conduct occurred at a time when she and her sister were at her aunt's house. When her aunt left to pick up her uncle, she would then be alone with defendant. She said it happened many times, for about two or three years. Fox was cross-examined as to his course of treatment of R.R. and her family. She did not receive any psychiatric medications.

### THE COURT'S RULINGS

The trial court noted that the rulings were to be made based on whether the time, content, and circumstances of the statements provided sufficient safeguards of reliability. The court found that there was insufficient evidence of the circumstances under which the statements in the telephone calls were made. The court ruled that the statements made to Rosemary in the car while she was on leave from the hospital were inadmissible for want of sufficient evidence of the circumstances under which they were made. The court opined that the child might have been trying to help her mother.

The court also excluded the conversations of R.R. with Koppien which were made late at night when the victim was tired and showed some confusion on her part. However, the court found that the statements to Fox were made in a clinical setting and were sufficiently reliable under the statutory standard. The court also found reliable the statements made in the question-and-answer interview with Sergeant Hudson.

### THE TRIAL

At trial, R.R. was able to identify various persons in the courtroom such as Sergeant Keane, her father, and the judge and the court reporter. She identified her father and mother by name and gave her address as Lee Center, where she lived with her Aunt Deb and Uncle John. She named her two sisters and gave their ages as four and two. R.R. said that she was six years old and was in the first grade. She named the defendant and identified him in the courtroom. Defendant lived with his parents, Aunt Betty and Uncle Fred, across the corn-

field from her house. R.R. called defendant both Fred and Johnny Kelker.

R.R. testified that the previous year she was in his bedroom with her sister and defendant. She was wearing her "flash" shorts which she identified as an exhibit. She said defendant "did bad things to me" on the bed. He stuck his hands down inside her pants under her underwear. She then identified her "private area," which she called her "woochie." She said that a man's private area was called a "worm." Defendant touched her on her "private." She told him to stop, but he did not, and it felt "rough." He touched her there "[p]robably a couple times." Defendant was sitting next to her as she was lying on the bed. She did not see anything happen with A.R. that same day. Her mother and father were at the doctor's that day. The incident happened before the fireworks on the Fourth of July when it was hot. She said that the person who did this was defendant who was sitting in the courtroom.

R.R. remembered when she was asked to look at some pictures to see if she knew who Johnny Kelker was, but she did not remember seeing Fred Jahn's picture as one of those pictures. She said: "But it looked like I did but it wasn't." She said that Fred lived with her Aunt Betty and Uncle Fred; Fred Jahn was never called Uncle Fred. It was Fred, the defendant, who touched her.

On cross-examination, R.R. agreed she had talked to a lot of people about this incident. She could not remember whether the sun was shining that day or whether it occurred after lunch. She remembered that her sister was in the house. Her Uncle Fred was at work and Aunt Betty had gone to pick him up. On redirect examination, she said that her uncle worked at Woodhaven, where her aunt went to get him. She remembered which shorts she had on when the incident occurred. She said she was telling the truth and no one had told her to say the things she had said. When asked why she was saying these things about Fred Jahn, she replied, "So I can tell the truth and get it over with."

Jerry Fox testified regarding his credentials and experience as a licensed clinical social worker; he was a member of the Academy of Certified Social Workers and was required to pass a national test to become a member. He had experience as a psychiatric social worker and treated children and adults. In 1980, he became director of social services at St. Anthony Hospital in Rockford, Illinois. By 1985, he was in full-time private practice as an individual and group counselor-therapist. He was frequently called upon in the emergency room in

child abuse cases and other types of trauma. He had been involved in hundreds of child sexual abuse cases.

Fox testified that he first treated R.R. on February 8, 1991, and continued to treat her. R.R. referred to Johnny Kelker in her treatment sessions from the beginning. She named Johnny Kelker and Fred Jahn as the same person and told Fox that Fred had sexually abused her. She indicated to him that it was digital penetration. The incident occurred in the bedroom at defendant's residence. He inserted his fingers into her "private" area or "woochie." She pointed to her genital area. She asked him to stop and said it was painful and she was frightened, but he refused to do so. She mentioned this conduct in each of the sessions. R.R. and Fox determined that the conduct occurred over a two- or three-year period.

Fox next described post-traumatic stress disorder, which occurred as a result of trauma such as child sexual abuse. The symptoms included nightmares, intrusive thoughts, depressions and anxieties that could be triggered by a stimulus. In Fox's opinion, R.R. suffered from post-traumatic stress disorder and a combination of adjustment disorder with a depressed mood. He stated that sexual abuse would be a traumatic event for this very young child and would be a determining factor for this disorder for R.R.

On cross-examination, Fox stated that R.R. had been referred to him by her mother, Rosemary, and he had preliminary information that R.R. had been sexually abused by Fred Jahn. Fox admitted that physical abuse could cause post-traumatic stress disorder. He stated that R.R.'s separation from her mother may have caused separation anxiety but did not necessarily cause post-traumatic stress disorder. On redirect examination, Fox said he found no evidence of physical abuse. He saw no connection between the post-traumatic stress disorder and her separation from her mother.

Detective Sergeant Keane Hudson testified that he was involved in the investigation of the case. He determined that defendant was approximately 35 years old and that the date of the incident which occurred when R.R.'s parents were away was June 19, 1990. Hudson spoke with R.R. on February 6 at the State's Attorney's office in the presence of Dan Fish and Susan Swegle. Hudson conducted the interview. R.R. stated that Johnny Kelker was the same person as Fred Jahn, the defendant, and he was her cousin. She said that "little" Fred, not "big" Fred, did bad things to her. Fred touched her private area and pointed to her vaginal area. She was wearing her "flash" shorts at the time. Fred took her to his bedroom, and he touched her "woochie" by placing his hands in her shorts and under her under-

wear while she was on his bed. She told Fred to stop and that it hurt, but he kept on touching her.

Hudson had another conversation with R.R. the following day in which R.R. said the incident occurred in the summer before the fireworks when her mother and father had gone to the doctor. Her Aunt Betty was baby-sitting her. R.R. was five years old at the time. Hudson also identified the shorts to which R.R. referred.

Defendant called Sergeant Michael Koppien of the Lee County sheriff's department to testify. According to Koppien, R.R. participated in a photographic lineup which he conducted on November 26, 1990, at the law enforcement center in Dixon. There were six photographs. The purpose of the lineup was to determine if the person referred to during the investigation as Johnny Kelker was in the lineup. Photograph No. 3 was a picture of defendant. According to Koppien, in looking at the photos for a few minutes, R.R. pointed to photo No. 3 and said "that looks like Uncle Fred but he's not here, he lives in Lee Center." She did not identify any of the photos as being a photo of Johnny Kelker.

On cross-examination, Koppien, who was a friend of R.R.'s family, stated that the children sometimes referred to Fred Jahn as Uncle Fred. Fred Jahn was not present at the police station when the lineup took place.

Defendant testified that he lived in Lee Center with his parents, Fred and Betty Jahn. He was 36 years old at the time of trial. He admitted that he was convicted of a felony in 1982 and 1986. R.R. was his second cousin, and he had known her all of her life. His mother baby-sat R.R. whenever Rosemary asked her to do so. He denied the incident that took place in June or July 1991 or that he ever touched R.R.'s vaginal area. He did not recall being left alone with R.R. and A.R. in June and then denied being left alone with them.

R.R.'s mother Rosemary was called as a rebuttal witness. She testified that R.R. was left at Betty and Fred Jahn's home on June 19, 1991, and Fred Jahn lived in the same home with them; it was located across the cornfield from Rosemary's home.

Before closing arguments began, the court cautioned the jury that what the attorneys said was not to be considered evidence. At one point, the prosecutor argued that R.R.'s testimony was truthful and consistent. He described the testimony of Koppien in the following manner:

> "MR. JACOBSON [Prosecutor]: Specifically he was asked about a lineup that occurred on November 26, 1990. In that lineup there were 6 pictures. The number 3 picture was **Fred**

Jahn and during that interview the comment that came out [*sic*] the testimony showed that Mike Koppien said that [R.R.] couldn't identify but specifically what Mike Koppien told you, Sergeant Koppien told you was that [R.R.'s] response was number 3, that looks like Uncle Fred but he's not here. But more importantly I want to ask you what was the question posed to her when she gave that response? The question was do you see Johnny Kelker.

MRS. LINKOWSKI [Defense attorney]: Objection, Your Honor. That was not in evidence.

MR. JACOBSON: I believe it was, Your Honor.

THE COURT: Overruled.

MR. JACOBSON: Do you see Johnny Kelker and the response was number 3 looks like Uncle Fred but he's not here. You heard Sergeant Koppien testify that because of his relationship with the children he knows that they refer to the defendant at times as Uncle Jahn or I mean Uncle Fred, sorry. That answer that [R.R.] gave was consistent because additionally I asked Sergeant Koppien was Fred Jahn there that day when that lineup occurred and the answer was no, he wasn't at the jail. Do you see Johnny Kelker? Number 3 looks like Uncle Fred but he's not here. That's as close to saying yes, this is Johnny Kelker, as a person is going to get without saying it.

MRS. LINKOWSKI: Objection, Your Honor, that contradicts what is in evidence.

THE COURT: I'm going to sustain the objection to that.

MR. JACOBSON: *** As the Court advised you my closing argument is not evidence. I trust your memory of what happened because you're the person that's going to decide what exactly was said ***. Neither what I say nor what counsel says is evidence in this case."

Among other things, defense counsel argued that the jury should consider the circumstances surrounding R.R.'s statements to Hudson and Fox and the long time span involved. She also asked the jury members to trust their memory and that they should pay particular attention to the testimony of Sergeant Koppien when he stated that R.R. said photograph No. 3 looked like Uncle Fred but he was not there.

Among the instructions given to the jury, the court repeated that the evidence consisted only of the testimony of the witnesses and the exhibits received and that the arguments of counsel not based on the evidence should be disregarded. The court also instructed the jury

that it was for it to determine the weight to be given the statements of R.R., her age and maturity, the nature of the statements and the circumstances under which they were made.

The jury returned a verdict of guilty.

### ADMISSIBILITY OF THE VICTIM'S STATEMENTS TO OTHERS

Defendant first argues that R.R.'s statements to Hudson and Fox were wrongly admitted into evidence because they did not possess sufficient indicia of reliability or trustworthiness required by the statutory exception to the hearsay rule. The court in *People v. Coleman* (1990), 205 Ill. App. 3d 567, 581, listed a number of nonexclusive factors for determining the reliability of out-of-court hearsay types of statements made by a child to others in ruling on their admissibility at trial in sexual abuse cases. Citing *Idaho v. Wright* (1990), 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139, the *Coleman* court listed such factors as spontaneity and consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. (*Coleman*, 205 Ill. App. 3d at 581.) However, the Supreme Court observed that there was no mechanical test for determining particularized guarantees of trustworthiness under the *confrontation clause* of the constitution. The Court noted that the unifying principle in these factors was whether the child declarant was particularly likely to be telling the truth when the statement was made.

Additional factors include the child's physical condition; the nature and duration of the sexual act; the relationship of the child and the accused; reaffirmance or recantation; whether the child is likely, apart from the incident, to have sufficient knowledge of sexual matters to realize the act is possible and sexually gratifying to some; whether the language is embarrassing and, therefore, only spoken if true; and whether it was a cry for help. *People v. Landis* (1992), 229 Ill. App. 3d 128, 134.

Defendant begins his argument by noting that it was error for the court to wait until it heard the testimony of the victim before ruling on the admissibility of the out-of-court statements. Because the victim only testified regarding the conduct that occurred in June 1990 and regarding the photo lineup on November 26, 1990, defendant argues that her testimony had no bearing on the admissibility of her out-of-court statements. Yet, defendant then concludes that, to the extent that the trial court considered the victim's trial testimony before ruling, the court was in error. This logic appears strained.

We are unable to discern why this procedure resulted in reversible error when both the child and the adult witnesses were available to testify and to be cross-examined. The section 115—10 witnesses were examined outside the presence of the jury. Furthermore, even where hearsay testimony is admitted, it is deemed harmless error to the extent that the statement is corroborated by the declarant's testimony at trial and defense counsel has the opportunity to cross-examine the declarant. (See *People v. Glass* (1992), 239 Ill. App. 3d 916, 923.) Defendant cites no pertinent authority that the time sequence the court used in determining the reliability of out-of-court statements automatically constitutes reversible error or requires a remand. Furthermore, the record does not show that defendant specifically objected to this procedure before or during the trial or in his post-trial motion, and the issue is therefore waived. See *People v. C.H.* (1992), 237 Ill. App. 3d 462, 471; *cf. People v. Dugan* (1992), 237 Ill. App. 3d 688, 698 (failure to object to disclosure procedure amounted to waiver; in a bench trial, although the reviewing court did not condone the procedure of entering reliability findings until after the witnesses had testified at trial, any error was harmless).

In relying principally on *Coleman* and *Wright*, defendant seems to ignore that these cases concerned statements made by very young victims who were *not* available to testify at trial and the evidence was presented as hearsay evidence; moreover, the defendant in each case was attacking the reliability of the statements on the basis that such evidence did not satisfy the confrontation clause of the constitution. The *Wright* Court did observe that, where the testimony is not admitted under a firmly rooted hearsay exception, the evidence must be so trustworthy that adversarial testing would add little to its reliability. Thus, where the admissibility of the hearsay evidence is challenged under the confrontation clause, the hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness and not by reference to other evidence at trial. (*Wright*, 497 U.S. at 821, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) While we acknowledge that the use of the hearsay statements in this case must be sufficiently reliable to be admitted under the statutory exception, the need for "particularized guarantees of trustworthiness" is not nearly as compelling as it is in a case where the complainant does not testify.

As one appellate court opinion has explained:

> "The legislature by enacting section 115—10 obviously determined that a corroborative complaint is sufficiently reliable to enjoy an exemption from the rule against hearsay evidence. [Ci-

tation.] A second or third complaint is no less reliable or credible. True, there is opportunity for exaggeration or embellishment the longer the time between the incident and each successive complaint. This factor is remedied though through cross-examination (and possible impeachment of the victim from prior inconsistent statements). [Citations.] Once the victim testifies and is subject to cross-examination, the rationale for the rule against hearsay virtually disappears." *People v. Branch* (1987), 158 Ill. App. 3d 338, 340-41, cited with approval in *People v. Anderson* (1992), 225 Ill. App. 3d 636, 648.

It is true that this court has found the *Wright* factors are useful in determining whether the victim's out-of-court statements are properly admitted. (*C.H.*, 237 Ill. App. 3d at 471.) However, as the *Wright* Court pointed out, these factors are not exclusive, and courts have considerable leeway in their consideration of appropriate factors. (*Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The overall operative principle is that the relevant circumstances to be examined are those surrounding the making of the statement and which render the declarant particularly worthy of belief. (*C.H.*, 237 Ill. App. 3d at 469.) The statute merely specifies that these hearsay statements are admissible only if the time, content and circumstances of the statement provide sufficient safeguards of reliability. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b)(1); *People v. Zwart* (1992), 151 Ill. 2d 37, 44.) This determination lies within the discretion of the trial court and will be overturned on appeal only when the record clearly demonstrates that the court abused its discretion. (*Zwart*, 151 Ill. 2d at 44.) With these principles in mind, we consider further whether the hearsay statements were sufficiently reliable so that defendant was not denied a fair trial.

■ The main thrust of defendant's argument is that the passage of time from the date of the offense until the victim reported the sexual abuse to the corroborating witnesses under section 115—10 makes the hearsay statements unreliable. Defendant suggests that the passage of time weakened the victim's recollection and allowed more opportunity for her later account to be affected by intervening contacts with investigators and events. According to her mother, R.R. began talking about Johnny Kelker in November 1990. Also, on November 26, 1990, R.R. was asked to identify Johnny Kelker in a photographic lineup conducted by Koppien. Koppien also interviewed R.R. on December 10. These statements occurred a little over five months after the date of the offense. However, except for the testimony concerning the photographic lineup by Koppien and R.R., these hearsay state-

ments were excluded from the trial testimony. R.R.'s statements to her mother in December were also excluded. However, the statements of R.R. made in February 1991 to Sergeant Hudson and to her therapist, Jerry Fox, were found sufficiently reliable to be admitted. R.R. made these statements nearly eight months after the June incident.

Although the spontaneity *may* be considered as a factor in considering the reliability of the victim's statements, section 115—10 does not require that the sexual conduct be reported promptly in order for the statements to be admissible. (*People v. Bailey* (1988), 177 Ill. App. 3d 679, 683.) Illinois courts have consistently recognized that a child's delay in reporting sexual abuse is common and the delay in making a complaint affects the weight and not the admissibility of the statements. (*Zwart*, 151 Ill. 2d at 51; see *In re M.M.* (1988), 171 Ill. App. 3d 334 (where court held that approximately six-month delay affected only the weight and not the admissibility of victim's statements under section 115—10); *People v. Anderson* (1992), 225 Ill. App. 3d 636 (where child had denied any sexual abuse when interviewed over 20 times over the course of a year by mental health director).) Thus, a delay of several months without more is an insufficient indicator that the statements are unreliable.

In *Zwart*, our supreme court found that there were insufficient indicia of reliability where a three-year-old child made statements to her mother approximately five weeks after the abuse occurred, particularly where there were *other factors* suggesting that the statements were unreliable. (*Zwart*, 151 Ill. 2d 37.) First, the child's tender age made her particularly susceptible to the suggestions of others; second, the defendant was unable to question the victim about the interviews at trial because the trial court found the victim incompetent to testify; third, the statements were only made after substantial adult intervention, and the child was interviewed by at least three persons (a police officer, a DCFS worker and a hospital staff member) before she admitted that she was abused where the child initially denied the abuse. Furthermore, the State failed to introduce any evidence regarding the substance of the interviews, and it was impossible to determine if there were suggestive interview techniques employed.

Defendant relies on the *Zwart* case, but that case is highly distinguishable because of the additional circumstances just enumerated. In the present case, the child was older and less susceptible to adult influence; when she testified at trial, her statements were clear and unequivocal regarding the essential elements of the crime; she was available for cross-examination; and the substance of the witnesses'

testimony concerning the interviews is a matter of record, and these witnesses were cross-examined by defendant.

■■ The defendant also speculates, but does not demonstrate, that the interviews of the corroborating witnesses were highly suggestive in inducing R.R.'s statements. There is no substantial support for this position in the record. While it is true that the court barred testimony of the December 10 interview and that of the mother because of stated weaknesses in the evidence surrounding the making of those statements, there is no evidence that the statements to Sergeant Hudson and to Jerry Fox in February were made under inherently unreliable circumstances. As to the statements to Hudson, the fact that the statements were made in response to questions does not render them inadmissible, and Illinois courts continue to admit the testimony of nurses, police officers and social workers who question victims. (*C.H.*, 237 Ill. App. 3d at 469; *People v. Server* (1986), 148 Ill. App. 3d 888, 900.) Our review of the pretrial testimony of Hudson reveals no evidence of a coercive atmosphere when he interviewed R.R. We find no abuse of discretion by the trial court.

The trial court also correctly admitted the testimony of R.R.'s therapist, Jerry Fox. Fox testified regarding the nonsuggestive techniques he used in allowing the child to express her thoughts and feelings. His testimony shows that the child volunteered information regarding defendant's sexual conduct with her.

### EVIDENCE OF UNCHARGED PRIOR CRIMINAL CONDUCT

Defendant next argues that Fox's testimony that defendant's sexual conduct occurred over a two- or three-year period was erroneously admitted under section 115–10. (See *Anderson*, 225 Ill. App. 3d at 650.) First, we point out that defendant failed to object to this testimony at trial and failed to raise it specifically in his post-trial motion. Therefore, the issue is waived, and we consider the issue only to the extent that the claimed error might constitute plain error (*People v. Glass* (1992), 239 Ill. App. 3d 916, 922); we conclude that it does not amount to plain error.

Although evidence of other crimes is not admissible merely to show a defendant's propensity to commit crimes, it is admissible when relevant for some other purpose such as to prove knowledge, intent, motive, absence of mistake, or *modus operandi*. Furthermore, it is well established that, in sexual offense cases, evidence of a defendant's prior sexual activity with the same child is admissible to show the defendant's intent, design, or course of conduct and to corroborate the victim's testimony. (*Anderson*, 225 Ill. App. 3d at 647.) Prior

sexual activity with the complainant may also be used to show that the parties had a continuing or intimate relationship or knew each other even though such facts are not in issue. *People v. Cregar* (1988), 172 Ill. App. 3d 807, 822.

The admission of evidence of other sexual misconduct under section 115–10 has been held to amount only to harmless error to the degree that such testimony amounts to excessive detail, there is otherwise substantial evidence of guilt, and the error does not appear to have affected the outcome of the trial. (*Anderson*, 225 Ill. App. 3d at 650-51.) In *Branch*, the court stated that, even where the corroborative witnesses refer to other uncharged conduct, the corroborative testimony may necessarily include some detail to effectively corroborate the fact that a complaint was made and to identify the incident as the one before the court. To the extent that the testimony of corroborating witnesses consists of impermissible detail, the testimony has been deemed harmless error. This is particularly so when the complainant is available for cross-examination and the details concern medical evidence or are particularly relevant to the testimony of the child abuse counselor. *People v. Branch* (1987), 158 Ill. App. 3d 338, 341. But see *People v. Schmitt* (1990), 204 Ill. App. 3d 820, 828-29 (admission of evidence of defendant's other uncharged sexual conduct with victim was not error under section 115–10).

■ In the present case, the prosecution did not emphasize defendant's prior misconduct with R.R., and the testimony was relevant to the therapist's opinion that R.R. suffered from post-traumatic stress. The course of conduct was relevant to show the relationship of the parties and served to support the symptoms of sexual abuse. It was not used merely to show defendant's propensity for criminal conduct. Furthermore, the evidence was not closely balanced. In view of the competent testimony of the victim regarding the elements of the offense and the other corroborating testimony, the evidence of defendant's prior misconduct with R.R. did not amount to plain error.

### THE PROSECUTOR'S CLOSING ARGUMENT

Finally, defendant argues that the prosecutor's statement during closing argument regarding R.R.'s purported identification of Johnny Kelker in the photographic array was so misleading to the jury that it constitutes reversible error. We disagree. A defendant is entitled to a trial free from improper prosecutorial argument, but a conviction will only be reversed if such remarks were material to the conviction and resulted in substantial prejudice. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 165.) Each case must be decided on its own facts. (*People v.*

*Bigsby* (1977), 52 Ill. App. 3d 277, 281.) Generally, a prosecutor is allowed great latitude in making a closing argument. (*People v. Jordan* (1990), 205 Ill. App. 3d 116, 122.) However, the prosecutor may not make arguments which are not based upon the evidence. (*Witted*, 79 Ill. App. 3d at 165-66.) The entire context in which a prosecutor offers statements will be considered. *People v. Phillips* (1989), 127 Ill. 2d 499, 524.

Defendant argues that the prosecutor mischaracterized the testimony of Koppien concerning the photographic lineup when the prosecutor suggested that Koppien specifically asked "Do you see Johnny Kelker?" While suggesting that this was the question may have been somewhat misleading, we do not find the prosecutor's characterization to be serious enough to have affected the outcome of the trial. The prosecutor also stated that when R.R. responded to Koppien, R.R. replied, "Number 3 looks like Uncle Fred but he's not here." The prosecutor continued, "That's as close to saying yes, this is Johnny Kelker, as a person is going to get without saying it." At this point, the trial court sustained defendant's objection that this statement was not supported by the evidence. The testimony actually showed that, after R.R. looked at the photos for a few minutes, she pointed to No. 3 and said, "that looks like Uncle Fred but he's not here, he lives in Lee Center." She did not in fact identify any photo as being a photo of Johnny Kelker.

The prosecutor's comments did not accurately reflect the testimony. However, the prosecutor appeared to be arguing that R.R.'s response was tantamount to an identification. The worst possible interpretation of this evidence would be that R.R. had identified defendant in the photo lineup when in fact she was not able to or that she was confused in trying to identify defendant from a photo. However, the overall trial testimony clearly shows that R.R. knew defendant well and identified him repeatedly as the same person known to her as Johnny Kelker. It is most unlikely that the jury was swayed by this argument because of the other substantial trial testimony regarding the identification of defendant.

Additionally, immediately after the court sustained the objection, the prosecutor himself explained that his argument was not evidence and that the jury should trust its own memory. Defense counsel also argued that the jury should trust its own memory particularly with respect to Koppien's testimony when he stated that R.R. said photograph No. 3 looked like Uncle Fred but he was not there. The court again cautioned the jury during the final instructions by noting that

the arguments of counsel not based on the evidence should be disregarded.

We believe that at best the argument was harmless error under the circumstances. We do not believe that the argument materially affected the jury's verdict. Any error was cured by the prosecutor's concession that his argument should not be considered evidence, by defense counsel's argument, and by the court's instruction to the jury to disregard arguments not based on the evidence. (See *People v. Cobb* (1989), 186 Ill. App. 3d 898, 916.) In examining the trial proceedings as a whole, we do not find that the prosecutor's remarks substantially prejudiced defendant or impaired his right to a fair trial. *Branch*, 158 Ill. App. 3d at 343.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

UNVERZAGT and WOODWARD, JJ., concur.