NO. 4-04-0795          Filed 12/28/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,          )     Appeal from
          Plaintiff-Appellee,                 )     Circuit Court of
          v.                                  )     Cass County
LISA Y. BUTLER,                               )     No. 02CF118
          Defendant-Appellant.                )
                                              )     Honorable
                                              )     David K. Slocum,
                                              )     Judge Presiding.
_____

          JUSTICE KNECHT delivered the opinion of the court:

          In June 2004, a jury convicted defendant, Lisa Y.

Butler, of one count of aggravated criminal sexual abuse (720

ILCS 5/12-16(f) (West 2000)) against her niece, K.B. (born April

5, 1984).  In August 2004, the trial court sentenced defendant to

four years' probation.  Defendant appeals, arguing (1) the State

erroneously introduced expert testimony that bolstered K.B.'s

credibility; (2) the admission of other-crimes evidence was

erroneous in that it engendered unfair prejudice that outweighed

any probative value; (3) the trial court erred by not giving a

contemporaneous admonition the jury should disregard  evidence of

other crimes when that evidence surfaced at trial; and (4) the

State failed to prove her guilty beyond a reasonable doubt.  We

affirm.

                         I. BACKGROUND

          On October 29, 2002, the State charged defendant and

her husband, John Butler, with committing sex offenses against

their niece, K.B.  The offenses involved two separate incidents

from September 2001 and the summer of 2000. These offenses included one count of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2000)) and two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(f) (West 2000)). The State nol-prossed the sexual-assault count and one count of aggravated criminal sexual abuse, both of which were based on the alleged September 2001 incident.

A jury trial proceeded on the remaining aggravated-criminal-sexual-abuse count. This count asserted during the summer of 2000, defendant and John committed aggravated criminal sexual abuse in that they, the aunt and uncle of K.B., who was at least 13 years old, but under the age of 18, "intentionally fondled, kissed, and sucked the breasts of [K.B.] for the purpose of sexual gratification."

At the consolidated trial of defendant and John, the State presented the testimony of six witnesses: Mary Butler, Mary Caslin, Gary Butler, N.B. (born August 20, 1980), Ryan Hill, and K.B.

Mary testified she was married to Gary, and they had two children, K.B. and N.B. John was her husband's brother; and defendant her sister-in-law. Mary, Gary, and their daughters N.B. and K.B. had a "normal family relationship" with John and defendant. In October 2001, Mary, Gary, and their daughters attended a family reunion attended by John and defendant. There, a family member, Kellie DuPre, told Mary she was concerned about K.B.'s and N.B.'s visiting John and defendant's residence. Mary

- 2 -

and Gary discussed DuPre's caution but believed they did not have enough information to act.

Mary testified, during the summer of 2000, K.B. was 16 years old.  She babysat for John and defendant's daughters. During that summer, K.B. also worked for the State of Illinois.

In early December 2001, Gary and Mary had separate conversations with K.B. and N.B.  Gary and Mary were concerned K.B. would have difficulty responding to them in person, so they asked her to write whether she felt uncomfortable or had been abused while at John and defendant's house.

K.B. returned about 40 to 45 minutes later with a letter.  Mary testified they were shocked at its contents.  She and Gary decided to have the same conversation with N.B. the next day.

After reading N.B.'s and K.B.'s letters, Mary and Gary took a few days to decide what to do next.  Within a week, they went to John's and defendant's house.  There, they had John and defendant read the letters.  Defendant stated, "that's not the way it happened."  Mary asked defendant to tell her what did happen. Defendant told her the following:  "When [K.B.] was over there babysitting that she had too much to drink and that [Mary] had helped [K.B.] to bed and that she [(Mary)] had helped her [(K.B.)] with her pajamas and that [K.B.] must have misunderstood."  Mary responded the letter stated more than one incident occurred.  Defendant responded, "[W]ell, sometimes when I drink I get affectionate and don't remember what I did and or what I do."

- 3 -

In their discussion, Mary asked defendant, "[d]on't you understand what you're living with?" Defendant responded, "John told me he'd never do anything with our children." John said nothing, except at some point he told defendant to shut up.

Mary testified she and Gary told defendant and John they would have to get counseling. Gary also said John would make every appointment, and if John did not make the first appointment within a week, he would take the letters to the police and to their parents. Within a week, defendant called Mary. A psychiatrist informed defendant if defendant and John spoke to him about such incidents, he would have to report them. Mary told defendant to keep the appointment until she could talk to Gary.

Mary testified K.B. had been seeing a counselor, Ann Godman, since she was 12 years old--before the incidents with John and defendant. K.B. was seeing Godman to deal with stress, emotional, and anger issues.

On cross-examination, Mary testified during the summer of 2000, K.B., then 16, was dating Ryan Hill, then 20. The two were dating secretly, without Mary's and Gary's approval. K.B. moved in with Hill in April 2002. They resided together almost a year. Mary admitted K.B. had lied to her in the past. K.B. lied to her about Hill.

Mary testified Godman, a mandated reporter for the State of Illinois, had not reported an incident of sexual abuse during the years she counseled K.B.. Mary did not know whether

- 4 -

K.B. and Godman discussed the allegations or alleged incidents.

Mary testified John and defendant had two daughters. In the summer of 2000, their daughters were between the ages of two and six. Their oldest daughter had been hospitalized that summer, undergoing chemotherapy for leukemia.

An estrangement between John and defendant and Mary's family began in October 2001. Mary testified N.B. and K.B. were not told not to go to John's and defendant's house, but Mary and Gary would not have allowed them to babysit or go there.

In February 2002, a police officer asked Mary to have a recorded telephone conversation with defendant. The purpose of the conversation was to see if they could get defendant to say something incriminating.

Mary Caslin worked as "a receptionist-bookkeeper-office manager" for Psychological Services of Central Illinois. She testified Mary Butler told her she and Gary were John's parents. She requested a letter stating John had been scheduled for a follow-up appointment.

A stipulation regarding Kellie DuPre's testimony was read to the jury. DuPre, age 32 at the time of the stipulation, was the niece of John and defendant as well as the niece of Gary and Mary. K.B. is her cousin. On October 7, 2001, DuPre hosted a Butler family reunion. DuPre denied she told Mary she should be concerned about the relationship between John and K.B.

Gary Butler testified both N.B. and K.B. babysat John and defendant's daughters, including in the summer of 2000. He

believed both babysat 7 to 10 times.  The families lived about 50 miles apart.

At the family reunion, Gary learned information from DuPre that concerned him about his daughters' going to John's house.  Gary testified he spoke with his brother, John, a day or two after the reunion.  Gary asked John if, at the reunion, he and defendant let K.B. drink alcohol.  Gary also asked John if he had offered beer to K.B. so she, N.B., and N.B.'s boyfriend could drink on the way home.  Gary stated he was outraged John would offer K.B. alcohol.  Gary further stated his daughters were not allowed to be around John without him present.

Gary spoke to K.B. in late October about his concerns.  K.B. was "very reluctant" to talk to her parents.  Gary and Mary later determined they would ask their daughters to write their concerns instead of talk about them.  In early December 2001, they did so.

When K.B. returned home on some date in December 2001, Gary and Mary sat with her in the living room.  They told K.B. they knew she had expressed concerns, but they did not have enough information to know what to do next.  They asked her if she ever felt uncomfortable at John and defendant's house and, while there, had she ever been verbally or physically abused.  K.B. took the notepad and returned about 30 minutes later.  She handed them a letter.

A day or two after they received the letter from K.B., Gary and Mary asked N.B. to write her concerns.  They gave N.B.

the same questions. N.B. returned about 25 minutes later and handed the note to Gary and Mary.

Gary testified he and Mary had long conversations about what they should do next. They went to John and defendant's home. There, Gary handed John and defendant the letters. Gary's testimony regarding their discussion was substantially similar to Mary's.

On cross-examination, Gary testified, in the summer of 2000, K.B. did not have her own car. She used her parents' car. When K.B. said she was going to John and defendant's, Gary did, sometimes, follow up to insure she was there.

Gary testified K.B. dated Hill, even though Gary forbade her from doing so. Gary was uncomfortable with the age difference.

Gary testified he understood the Department of Children and Family Services (DCFS) and the police became involved because of a report by Godman.

N.B. testified John arranged state jobs for her. N.B. was not expected to do anything in return for these jobs, but she babysat John's children as a thank you. N.B. began babysitting John's children when she was about 16 or 17. To babysit, N.B. sometimes drove from her home to Ashland. Other times, John and defendant would pick her up. At times, she would meet them in Springfield, where they worked.

N.B. participated in campaign activities with John. She "helped do campaign fliers and different things" for Governor

Ryan's campaign. In January 1999, N.B. attended inaugural activities with John and defendant in Springfield. N.B. testified John and defendant provided her alcoholic drinks. N.B. believed she consumed four or five drinks that night.

John and defendant secured a hotel room for the evening. When they arrived at the hotel room, N.B. put on boxer shorts and a T-shirt and got ready for bed. Two beds were in the room. N.B. sat on a bed. Her feet and back hurt from the evening. She "was just kind of stretching out" and "rubbing [her] shoulders and stuff." Defendant then began rubbing her back "to try and loosen [her] back muscles." At that time, N.B. was lying on the bed. While this was occurring, John was sitting on the bed across from them. He faced them. When defendant started rubbing her back, John said how pretty N.B. was. Defendant said, "yes." John then commented that he wanted to see more. Defendant rubbed N.B.'s back, under N.B.'s shirt, about 10 or 15 minutes. Defendant "came around and touched" N.B.'s right breast. It was not an accidental touch. When it occurred, N.B. sat up. John "made a comment about wanting to see more, and said something to the effect of wanting to see us kiss." Defendant said something like, "Oh, John."

N.B. went to the bathroom, where she stayed for five minutes or more. When N.B. exited the bathroom, John and defendant were in bed. N.B. "got into the other bed and went to sleep."

N.B. testified she was intoxicated when they returned

to the hotel that night.  When asked if she was intoxicated when defendant touched her breast, N.B. said, "yeah, a little bit." N.B. testified no other incidents like this occurred involving her.  N.B. did not report the incident to anyone until she wrote the statement to her parents in December 2001.

In October 2001, N.B. attended the family reunion. There, N.B. had an altercation with John.  They were sitting in the garage, where there was a container with ice and alcoholic beverages.  K.B. and N.B. were talking about plans for the evening; K.B. "was going to go out with some friends."  John told K.B., referring to the alcohol, take as much as you want.  He began handing it to her.  N.B. yelled at John.  She told him he was not going to give her alcohol, K.B. was underage, and K.B. was not to drink and drive.  John "acted like it was no big deal."

Around Christmas, N.B.'s parents asked her to write down anything that occurred that she thought was inappropriate and she did not feel comfortable telling them.  N.B. did as she was asked.  N.B. read the note to the jury:

> "On the night of Governor Ryan's inaugu-
> ration, I was invited to go with John and
> [defendant] to the parties and then the ac-
> tual inauguration.  We stayed at the hotel
> together, and when we were going to bed [de-
> fendant] started rubbing my back, as I was
> lying on the bed, and John was on the other

one watching.  Then he said to [defendant]
something to the effect of [']don't you think
she, 'me', is pretty.[']  And [defendant]
agreed.  And as things continued she asked
him if he liked watching her and me.  He said
he did.  And I'm not sure about his exact
words, but he said something about wanting to
see us do more, like kiss.  She told him to
be quiet, and I can't remember, but she
stopped, and I went to bed.  And I was 18."

N.B. acknowledged her statement did not include an allegation defendant touched her breast.  N.B. did not provide that detail because she felt ashamed and afraid her parents would be angry with her.

On cross-examination, N.B. denied embellishing her original statement.  N.B. testified when she wrote the statement for her parents, she did not want to provide great detail because she was ashamed.  N.B. acknowledged stating at the pretrial hearing she was 17 years old when the above-mentioned incident occurred.

Regarding the summer of 2000, N.B. testified she could not recall how often she babysat for John and defendant's children; she believed it was possible she babysat 7 to 10 times.  N.B. was not even sure if she had.  N.B. admitted she had spent the night at John and defendant's house on several occasions since the January inauguration.  N.B. also knew K.B. was going to

John and defendant's house to babysit. N.B. stated John and defendant had not been charged based on her allegations in her letter.

Ryan Hill testified, in the summer of 2000, he and K.B. began dating again. At first, K.B.'s parents did not know they were dating, because her parents did not approve. In 2003, the two became engaged, and they resided together. At the time of Hill's testimony, they were not dating. They talked occasionally.

Hill testified he was at the home of John and defendant in June or July 2000. K.B. had invited him. Defendant said to come out and have drinks with them. When Hill arrived, he learned John and defendant's children were asleep. John, defendant, and K.B. had been drinking. Hill consumed "a couple beers."

That evening, they played "Truth or Dare." Hill did not propose playing the game; neither did K.B. Either defendant or John suggested playing the game. As the game progressed, over the course of several hours, K.B. "was wearing almost nothing." Hill was in his boxers. John wore nothing at all; defendant was in her lingerie. They were drinking.

During the game, defendant was dared to kiss K.B.'s body. Defendant kissed K.B.'s breasts. Hill heard defendant say to K.B., "You like this. You've done this before," and "You've always liked it in the past." Hill was dared to kiss defendant's breasts and K.B. at the same time. John did not touch K.B. He,

- 11 -

however, initiated "the [T]ruth or [D]ares between defendant, [K.B.] and I." John had physical contact with defendant only. When K.B. became uncomfortable, they ended the games. John and defendant began engaging in sexual activity. K.B. and Hill left the room. Hill stayed at John and defendant's house. K.B. "wasn't that intoxicated." Over the three- to four-hour period, she had two to four drinks. He did not know how much alcohol she consumed before he arrived. Hill left the next morning. John and defendant were up. No words were spoken.

On cross-examination, Hill testified he was "verbally forced" to play Truth or Dare. K.B. was topless. Hill was not charged with any crime for having participated in Truth or Dare. Hill did not report the incident to the police. He said he "didn't understand how uncomfortable K.B. had been."

In May 2002, Hill received a phone call from K.B. They had not spoken for several months. K.B. wanted Hill to talk to the Illinois State Police. Later, in 2002, the two began dating again.

K.B. testified, in the summer of 2000, she worked for the State. John had gotten the job for her. K.B. also babysat for John and defendant's daughters. In that summer, she believed she babysat them five or six times. When she babysat, K.B. would sometimes drive to John and defendant's home. Other times, she would ride from Springfield with John.

K.B. testified Hill was her boyfriend that summer. K.B. testified she saw Hill "maybe once a week." One day in June

2000, while K.B. was babysitting at John and defendant's house, K.B. called Hill and invited him over. It was early evening on a weekend.

Between the time K.B. called Hill and the time he arrived, the girls went to sleep. K.B. sat in the living room and drank one to three beers. When Hill arrived, K.B. gave him a tour. John and defendant offered him a beer, which he accepted. John or defendant initiated a game of Truth or Dare. During the game, K.B. and Hill continued to drink alcohol provided by John and defendant. They played for "[a] couple hours."

When asked to describe the game, K.B. testified during the game, after she had removed her shirt, John dared defendant to kiss K.B.'s breasts. Defendant massaged K.B.'s breasts, licked them, and kissed her nipples. The game became so extreme, John and defendant began having sex in front of Hill and K.B. At that point, K.B. told Hill she did not want to do any more. John did not touch K.B.

K.B. testified defendant apologized to her the next morning. Defendant told K.B. not to mention the incident because she and John could lose their jobs and their daughters. K.B. babysat for John and defendant's daughters at other times after this incident.

In October 2001, K.B. attended the family reunion. Before K.B. left the reunion, N.B. and John argued after John tried to give K.B. alcohol to take home. K.B. did not take the beer.

In November or December 2001, K.B.'s parents asked her to write down any incidents involving John and defendant. K.B. read her letter to the jury:

"It was both physical and verbal. John, [defendant,] and I would all drink beer or whatever was there. When I was fairly drunk, [defendant] would start to kiss me and touch me. She would take my clothes off and touch me. John would just watch, but after a while he would try to touch me, too. I wouldn't let him do that though. After a while. I would pretend to pass out. They would usually stop after that, but there was one time when I was passed out John and [defendant] had sex, and I heard John tell [defendant] that he wanted to have sex with me. This would all take place after [their daughters] had gone to sleep--I'm sorry--to bed. This has happened several times, like every time I go up there to baby[]sit the girls. The morning after this would happen, they would tell me not to say anything to anyone because they would get in trouble and might lose the girls. No one else would be there when it happened, other than [the girls], who were always asleep."

On cross-examination, K.B. testified after October 2001, she was told by her parents it was best that she not go to John and defendant's. Regarding the letter, K.B. stated the incident was "something very personal." She stated, "It's not something that you tell everything." Her parents did not say what they were going to do with the letters. K.B. acknowledged she did not mention Hill in her letter and she, in fact, said no one else was present.

K.B. testified she had been seeing Godman for counseling since she was 12 or 13. When K.B. spoke with Cynthia Robbins with the Illinois State Police, she spoke to her and Patty Gielow of DCFS. Neither her parents nor her sister was present. K.B.'s statement was recorded. Robbins emphasized the importance of K.B.'s being truthful. In the interview, K.B. did not mention Hill.

In April 2004, K.B. interviewed with Trooper Payton, whom K.B. believed to be Robbins's assistant. K.B. testified she said the sexual misconduct occurred every time she went to John's and defendant's house. K.B. testified it may not have occurred during one of her visits. During the summer of 2000, K.B. testified, the events occurred five to six times. K.B. could not remember the dates when questioned by counsel, or by the police.

K.B. admitted reading the transcript of her statement to Payton. K.B. denied the statement she gave differed from her testimony at trial. She recalled telling Payton that on a Friday night John picked her up at work and took her to his and

defendant's home. There, defendant rubbed her neck, stomach, breast, and the top of her legs. Defendant penetrated her with one or two fingers, while straddling her. K.B. told Payton she ran to the bathroom to get away from the incident. When she returned, defendant's behavior continued. K.B. pretended she was going to pass out. K.B. did not leave John and defendant's house. She woke the next morning and had breakfast. On Sunday morning, defendant apologized.

The Saturday of that same weekend. defendant suggested K.B. invite Hill to their house. Defendant knew K.B.'s parents would not let K.B. see Hill.

K.B. agreed with the timeline espoused by counsel. In February 2002, defendant did not say anything incriminating during the taped call. Hill became involved in the case in March 2002. K.B. stated she did not give Hill's name earlier "[b]ecause this was a family matter, and I didn't want to get anyone else involved."

K.B. did not recall whether John and defendant's daughter was hospitalized during the summer 2000. K.B. believed the daughter may have been in remission that summer. K.B. did recall calling defendant because her daughter's fever spiked. John and defendant returned home and took their daughter to the hospital. K.B. denied defendant was upset with her, and she denied defendant no longer had her babysit. When John and defendant took their daughter to the hospital, they left their other daughter in K.B.'s care.

- 16 -

K.B. testified she recalled meeting with the police in late December 2001. Although K.B. knew the importance of telling the truth and the gravity of the allegations, she "didn't disclose everything." She acknowledged she lied in her letter when she said no one else was present.

K.B. testified she first told the police about Hill's involvement in May 2002. K.B. admitted she had not, until April 28, 2004, told officers about the incident in which defendant digitally penetrated her vagina.

On redirect examination, K.B. testified she did not bring up Hill's name because "[t]his was a family matter, and I didn't--I hadn't talked to [Hill] in a very long time." She did not want to get him involved. K.B. did not include the details about the incidents because she was "ashamed and scared."

The State rested.

Defendant and John presented the testimony of three witnesses: Elizabeth Wallbaum (Liz), Ashley English, and defendant.

Liz Wallbaum, defendant's mother, testified during the summer of 2000, John and defendant's older daughter was undergoing treatment for leukemia. She babysat for the daughter every day. Around 7 or 7:30 a.m., Liz would arrive at John and defendant's house. Ashley English assisted her every day during the summer. The girls did not go to day care. Liz visited on weekends. Not once during the summer of 2000 did Liz see K.B. come home with John or defendant or even visit their home.

Liz testified on May 20, 2000, she attended a wedding also attended by John and defendant. K.B. babysat the girls at John's and defendant's home. At the reception, defendant called to check on the girls and learned the older had a fever. They returned home and took her to the hospital. They also took the younger daughter to the hospital with them, where Liz picked her up.

On cross-examination, Liz testified she babysat the children until John and defendant returned home from work around 5:30 or 5:45. Ashley went home on her own. She did not watch the children on Saturdays and Sundays.

Ashley English testified she babysat John and defendant's daughters during the summer of 2000, when she was 12. She arrived at around 7 or 7:30 a.m. each day. Liz was always there before her. John and defendant always left in separate cars. Defendant would return home first, with John "nine times out of ten" staying in Springfield getting medicine or working. English left defendant and John's home whenever John or defendant returned home.

English testified she was not normally at John and defendant's home on weekends. She testified she may have visited "once, twice every two weekends."

Defendant testified she was 36, and she and John had been married almost 11 years. Her daughters were 8 and 6. Defendant had been employed for the State of Illinois, the Department on Aging, for 17 years. At the time of her testimony,

John was a woodworker.  Before the charges against him, John had worked for the State of Illinois for "close to 20 years."

Defendant denied the allegations against her. Defendant testified during the summer of 2000, her mother, Liz, watched the girls.  Defendant's daughters were not in day care at all.

In May 2000, K.B. babysat defendant's daughters while John and defendant attended a wedding.  K.B. drove herself to their house.  During the reception, defendant called to check on her daughters.  K.B. reported the older daughter was not feeling well.  Defendant asked K.B. if she had taken her temperature. She had not.  Defendant asked her to do so, and, after K.B. returned to the phone, she reported a temperature of 103.9.  John and defendant left immediately to take their daughter to the hospital, because the high temperatures were "very serious" for her given her leukemia and treatments.  When she arrived home, defendant told K.B. she was upset about the temperature and said she did not know why K.B. had not tried to contact them sooner. John and defendant took both girls to the hospital.  Defendant testified K.B. did not babysit for her girls again after May 20, 2000.  Defendant was not happy with the care she provided.

Defendant testified regarding a number of events in which her family participated in June 2000.  These included treatment for her older daughter, defendant's younger daughter's birthday party, out-of-town visits, and a cookout at Gary and Mary's.

- 19 -

Defendant, when asked about her relationship with Gary and Mary and their family before October 2001, testified they "kind of tolerated each other." Whenever the families were together, "[t]here was always a lot of friction." John "and Gary never really saw eye-to-eye on anything." Defendant's relationship with K.B. was "[j]ust normal."

Defendant testified regarding the family reunion. Defendant testified two incidents occurred there. First, N.B. complained her back hurt because her boyfriend took her shopping for her birthday, "bought her everything under the sun," and she carried the shopping bags. Defendant said she "told her I thought that they acted like little rich bitches." Second, defendant heard N.B. yelling at John. N.B. told defendant John tried to offer K.B. a beer. Defendant asked John what he was doing. John responded K.B. was "smarter than that" and was "not going to take a beer."

The day after the reunion, defendant tried to call Mary and talk to N.B. and K.B. to apologize for the name calling. Mary would not let defendant talk to the girls. The next day, Gary called John. Defendant understood N.B. and K.B. were not to be around her or John.

In December 2001, Mary and Gary came to defendant's home. They handed defendant and John the letters. Defendant told them "it didn't happen like that." John said "this didn't happen at all." Mary said defendant and John were "sick." John told them to leave. Mary said they would not leave until John

and defendant agreed to counseling. John and defendant continued to tell them the allegations were not true and their daughters lied to them. Gary responded his daughters did not lie. Because defendant was frightened exposure of the letters could result in losing her children, she agreed to counseling. Before they attended counseling, defendant contacted an attorney. Her attorney told her if she attended counseling and even mentioned the allegations, those allegations must, by law, be reported by the counselor. The attorney was not certain, however. He told them they could go to counseling but not to mention the allegations.

At the counseling session, defendant and John discussed their daughter's illness and the 2 1/2 years of chemotherapy. They also talked about the stress of the house fire. Defendant asked the counseling office to send a letter to Gary and Mary to show they had been to counseling.

Defendant and John stopped attending counseling after her attorney called Gary and Mary's ultimatum blackmail. John called Gary to say they would not go to counseling for something they did not do.

Defendant testified N.B. wanted to go to the Governor's inaugural ball with them. After the receptions, they stayed at a hotel in Springfield. Defendant did not know if N.B. was drinking. She and John were. When they got to the hotel room, each changed into their pajamas separately in the bathroom. N.B. complained her back hurt, so defendant rubbed it for her.

Defendant denied touching her breasts or doing anything inappropriate.

Defendant testified DCFS had investigated John, defendant, and her daughters. The girls had not been removed from defendant or John.

On cross-examination, defendant testified N.B. babysat her girls in 1998 or 1999 "[a] couple different times." They asked K.B. to babysit for a wedding because she had been around her children and had helped Mary with her day care. Typically, Liz or defendant's brothers babysat the girls. Defendant testified K.B. lied about saying it was typical for her to stay overnight at their home.

Defendant testified her older daughter had been in day care up until the time she was hospitalized after the wedding. Defendant testified her daughter may have been in day care on June 2, 2000, as well as on some other days that month.

The defense rested.

The State called Dr. Helen Appleton to testify in rebuttal. Appleton testified she was a clinical psychologist. Appleton testified she became involved in the case to review the transcripts and interviews to "give an opinion as to whether the reports in the interviews were consistent with how teens talk about sexual abuse." Appleton did not meet with K.B. or N.B.

Appleton testified her clinical experience and research indicate a delay in teens reporting sexual abuse, particularly when a relative was involved. Appleton testified the literature

and her experience indicated piecemeal reporting: "Part of the story is told, and then more is told later." The reasons for the piecemeal disclosure included repeated abuse, shame, and embarrassment.

Appleton testified she reviewed two of K.B.'s interviews. She found the piecemeal-type disclosure she discussed. Dr. Appleton further testified it was her opinion, "within a reasonable degree of psychological certainty," "N.B and K.B. both had delayed reporting and K.B.'s reporting was piecemeal."

On cross-examination, Appleton testified she did not study the home life of K.B. She agreed people sometimes lie, starting with a small lie that grows to a bigger lie. She acknowledged a teenager may lie for different reasons, including to cover up serious problems in his or her life or to divert attention away from other matters. Appleton testified she did not study or analyze whether K.B. had a pattern of lying. She acknowledged she did not know whether what K.B. said was part of a pattern of lying. Appleton acknowledged young adults may tell elaborate stories that appear believable. Appleton testified she made no opinion as to whether K.B. is believable. Appleton was not aware both K.B. and N.B. stated they have lied.

Appleton testified piecemeal reporting is often viewed by a layperson as a lie. She conceded piecemeal reporting could sometimes be an elaboration of a lie. Appleton acknowledged the job for the jury was to ascertain whether N.B. and K.B. are lying

or telling the truth.

The jury found John and defendant guilty of aggravated criminal sexual abuse. The trial court sentenced defendant to four years' probation and John to three years' imprisonment.

This appeal followed.

## II. ALLEGED ERROR IN ADMITTING PSYCHOLOGIST'S TESTIMONY

On appeal, defendant first argues the trial court erred by allowing Appleton's testimony. Citing People v. Simpkins, 297 Ill. App. 3d 668, 697 N.E.2d 302 (1998), defendant maintains Appleton's testimony improperly bolstered the testimony of K.B. and N.B. and removed the task of determining credibility from the jury.

We find no error. In Simpkins, the child victim recanted her statements the defendant sexually abused her. The State elicited testimony from a DCFS investigator that established the victim had told the investigator of the abuse. The trial court then, over objection, permitted the investigator to testify "in his experience, recantation occurs in 50% of the cases." Simpkins, 297 Ill. App. 3d at 674, 697 N.E.2d at 306. The investigator then testified causes of recantation include blame from family members. Simpkins, 297 Ill. App. 3d at 674-75, 697 N.E.2d at 306.

This court found the trial court erred by permitting the investigator's testimony regarding recantation. We held, first, the testimony did not assist the jury in reaching its verdict because no evidence was presented to show the victim

- 24 -

recanted because she felt blame from her family. Simpkins, 297 Ill. App. 3d at 682-83, 697 N.E.2d at 311-12. We further held the testimony constituted improper commentary on the victim's credibility. Simpkins, 297 Ill. App. 3d at 683, 697 N.E.2d at 312.

Here, unlike in Simpkins, the expert testimony found support in the testimony of the laywitnesses. Appleton testified teens suffering sexual abuse by a relative often experience a delay in reporting and piecemeal reporting due to shame. Trial testimony and evidence shows K.B. and N.B. testified they delayed reporting, K.B.'s reporting could be seen as piecemeal, and both testified to experiencing shame.

In addition, Appleton's testimony does not constitute improper commentary on the credibility of N.B. and K.B. In Simpkins, the investigator's testimony was presented in the State's case-in-chief, and the jury knew the investigator interviewed the victim. See Simpkins, 297 Ill. App. 3d at 673-74, 697 N.E.2d at 305-06. Here, Appleton's testimony came in rebuttal, following defense counsel's repeated emphasis on the discrepancies in and development of K.B.'s statements. Appleton's testimony pointed out, in a neutral way, the discrepancies did not necessarily mean N.B. and K.B. were lying about the sexual abuse. Appleton told the jury she had not spoken to either N.B. or K.B. and she had not made any determination as to whether the two women were credible. Appleton's testimony aided the trier of fact, while leaving that

trier of fact to determine the issue of credibility.  Simpkins
does not bar the expert's testimony in this case.

Defendant's other case law is also distinguishable.  In
People v. Howard, 305 Ill. App. 3d 300, 307, 712 N.E.2d 380, 384
(1999), the court considered expert testimony that specifically
stated the child victim's mother's testimony was credible: the
expert testified the woman suffered battered-woman syndrome and
"there was no evidence that [she] was trying to deceive her or
that she was lying."  In People v. Williams, 332 Ill. App. 3d
693, 695-96, 773 N.E.2d 1238, 1240-41 (2002), as in Simpkins, the
evidence of recantation was presented in the State's case in
chief and the purported expert had spoken with the alleged
victim.

### III. ALLEGED ERROR IN ALLOWING ALLEGED VICTIM'S SISTER TO TESTIFY ON PRIOR BAD ACT

Defendant next argues the trial court erred by allowing
N.B. to testify regarding a prior bad act.  Defendant maintains
the probative value of that testimony was outweighed by the
unfair prejudice it generated.  Defendant contends the trial
court should have granted her motion in limine to exclude it.

Under section 115-7.3 of the Code of Criminal Procedure
of 1963 (725 ILCS 5/115-7.3 (West 2002)), evidence of uncharged
sex offenses is admissible if the conditions set forth therein
are met.  See People v. Reed, 361 Ill. App. 3d 995, 999, 838
N.E.2d 328, 331-32 (2005).  The condition at issue here is that
the probative value of such evidence must outweigh undue
prejudice.  See 725 ILCS 5/115-7.3(c) (West 2002).  When

- 26 -

considering the probative value of the offered evidence, the trial court "may consider" the following factors: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2002). This court will not disturb a trial court's decision on whether to admit other-crimes evidence under section 115-7.3 absent an abuse of discretion. See People v. Donoho, 204 Ill. 2d 159, 182, 788 N.E.2d 707, 721 (2003); see also People v. Boyd, 366 Ill. App. 3d 84, 91, 851 N.E.2d 827, 835 (2006). An abuse of discretion will not be found unless "the trial court's evaluation is 'arbitrary, fanciful or unreasonable"' or '"where no reasonable man would take the view adopted by the trial court."'[Citations.]" Donoho, 204 Ill. 2d at 182, 788 N.E.2d at 721.

We find the trial court did not abuse its discretion in admitting N.B.'s testimony. Consideration of the factors of section 115-7.3(c) establishes the probative value of N.B.'s testimony outweighs the prejudicial effect. The first factor weighs toward admission: the charged and uncharged conduct occurred approximately 17 months apart.

In addition, the second factor further supports the trial court's decision. Defendant maintains the facts constituting evidence of uncharged prior bad acts must be "nearly identical" to the charged conduct to be admissible. Defendant's interpretation of the law conflicts with our supreme court's case

law, under which the threshold is significantly lower.  In Donoho, the court held "to be admissible, other-crimes evidence must have 'some threshold similarity to the crime charged.'" Donoho, 204 Ill. 2d at 184, 788 N.E.2d at 722, quoting People v. Bartall, 98 Ill. 2d 294, 310, 456 N.E.2d 59, 67 (1983).  The Donoho court further concluded when other-crimes "evidence is not being offered under the modus operandi exception, 'mere general areas of similarity will suffice' to support admissibility." Donoho, 204 Ill. 2d at 184, 788 N.E.2d at 723, quoting People v. Illgen, 145 Ill. 2d 353, 373, 583 N.E.2d 515, 523 (1991).  In this case, modus operandi is not an issue; thus, even general areas of similarity are sufficient.  See People v. Stanbridge, 348 Ill. App. 3d 351, 355, 810 N.E.2d 88, 93 (2004) ("Evidence of modus operandi, or mode of operation, is useful when the identity of the perpetrator is in dispute").

Here, significant factual similarities appeared between the uncharged and charged conduct.  Both incidents involved a teenage, female relative in John's and defendant's care.  Both incidents involved John's and defendant's giving alcohol to underage minors.  In addition, both incidents had defendant initiating physical contact, while John watched and encouraged that contact.  Given the proximity in time between the incidents and the factual similarities between the two, the trial court did not abuse its discretion in allowing N.B.'s testimony.

Stanbridge is factually distinguishable.  In Stanbridge, this court found the trial court erred when it

admitted evidence of sexual conduct that occurred 10 years before

the trial (see Stanbridge, 348 Ill. App. 3d at 356-67, 810 N.E.2d

at 94).  Here, the relevant offenses were more proximate--with

approximately 17 months separating the contact involving N.B. and

the charged conduct involving K.B.

### IV. ALLEGED ERROR IN ADMISSION OF ADDITIONAL OTHER-CRIMES EVIDENCE AND COURT'S FAILURE TO SUA SPONTE GIVE LIMITING INSTRUCTION BEFORE SUCH TESTIMONY

Defendant next argues the trial court erred by not

giving contemporaneous admonitions to the jury when the State's

witnesses injected cumulative and "highly prejudicial collateral

crimes evidence" into the trial.  Defendant emphasizes two pieces

of testimony: (1) Hill's testimony defendant stated to K.B., "You

like this.  You've done this before ***.  You've always liked it

in the past"; and (2) testimony defendant stated "John told me

he'd never do anything with our children."  Defendant

acknowledges these alleged errors were not raised in a posttrial

motion, but she urges this court to find plain error.

Defendant's complaint on this issue centers on the

trial court's failure to give contemporaneous admonitions to the

jury.  Defendant, however, neither requested such limiting

instructions at trial nor provided us authority to show the

absence of such admonitions is reversible error.  Defendant

relies on this court's decision in People v. Brown, 319 Ill. App.

3d 89, 745 N.E.2d 173 (2001).  In Brown, we "suggested" these

admonitions:

"Because other-conduct evidence poses a risk

of significant prejudice to defendant, this court has <u>suggested</u> trial courts not only instruct the jury in accordance with IPI Criminal 4th No. 3.14 at the close of the case, but also at the time the evidence is first presented to the jury." (Emphasis added.) <u>Brown</u>, 319 Ill. App. 3d at 100, 745 N.E.2d at 183.

<u>Brown</u> does not hold the failure to provide such admonitions requires reversal.  In fact, our supreme court, while acknowledging the better practice is to provide contemporaneous instructions, specifically held the failure not to instruct the jury at the time the other-crimes evidence was admitted "does not mandate reversal."  <u>People v. Heard</u>, 187 Ill. 2d 36, 61, 718 N.E.2d 58, 72 (1999).  The <u>Heard</u> court, in its case, found the defendant received a fair trial when proper admonitions were given only after closing argument.  See <u>Heard</u>, 187 Ill. 2d at 61, 718 N.E.2d at 72-73.

What <u>Brown</u> does require is the jury be instructed "on the limited purpose for which such evidence can be considered."  <u>Brown</u>, 319 Ill. App. 3d at 99, 745 N.E.2d at 183.  The trial court here instructed the jury on the limited purpose for the other-crimes evidence:

"Evidence has been received that the Defendants have been involved in conduct other than that charged in the information.

This evidence has been received on the issues of the [d]efendants' intent, motive, design[,] and propensity to commit the offense charged in the information and may be considered for you only for that limited purpose."

The trial court further instructed the jury to ignore evidence that was withdrawn.

We reiterate our suggestion contemporaneous instructions should be given with other-crimes evidence; but, given the holding in Heard and the trial court's instructions following closing argument, the failure to so instruct is not reversible error.

## V. REASONABLE-DOUBT CHALLENGE

Defendant last argues the State failed to prove her guilty beyond a reasonable doubt. Defendant maintains K.B.'s testimony was "heavily impeached," while her own testimony was corroborated by testimony that was uncontradicted and unimpeached. Defendant maintains the evidence shows "it was extremely unlikely that any incident involving sexual misconduct could have occurred in the defendant's home from early on a Friday afternoon extending into a Sunday morning during the summer of 2000."

When asked to review "the sufficiency of the evidence of a criminal conviction," our task is to consider the evidence "in the light most favorable to the prosecution" and decide

whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." People v. Ward, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 558-59 (2005). We must carefully examine the record, "while giving due consideration to the fact that the court and jury saw and heard the witnesses." People v. Smith, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999). This court must "reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." Smith, 185 Ill. 2d at 542, 708 N.E.2d at 370.

Defendant maintains the evidence is so improbable it justifies a reasonable doubt of defendant's guilt because the evidence shows K.B. did not babysit her daughters after May 2000 and K.B. did not stay at her home over a weekend in the summer of 2000. Defendant emphasizes the testimony of her mother Liz and of English.

Contrary to defendant's arguments, there are questions in Liz's and English's testimony. Liz testified defendant's daughters were not in day care in the summer of 2000, while defendant's own testimony establishes her older daughter "may have been" in day care on Friday, June 2, 2000, and on other days in the summer. Liz and English babysat while defendant and John were at work, but neither she nor English provided regular baby-sitting on the weekends. They occasionally dropped in. In addition, their testimony was contradicted by the State's witnesses. Testimony of Gary, Mary, K.B., and Hill established

K.B. babysat defendant's daughters and was at defendant's home in the summer of 2000.

The evidence in this case is not "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt."  See Smith, 185 Ill. 2d at 542, 708 N.E.2d at 370.  As shown above, Liz's, English's, and defendant's testimony is not determinative.  A jury could reasonably disregard defendant's testimony, believe Liz and English, and still conclude K.B. was there.  Moreover, we recognize K.B.'s testimony expanded from her initial exposure of the events to her parents.  The jury could, however, have attributed the piecemeal reporting to the abuse itself and to the shame that follows.  Last, Hill may have been biased, but whether such bias influenced Hill's testimony is an issue for the jury.

VI. CONCLUSION

We affirm the trial court's judgment.  As part of our judgment, we grant the State its statutory assessment of $50 against defendant as costs of this appeal.

Affirmed.

DONOVAN, J., concurs.

COOK, J. dissents.

JUSTICE COOK, dissenting:

I respectfully dissent and would reverse and remand for a new trial.

A trial court should allow expert testimony only where (1) the expert has knowledge and qualifications uncommon to laypersons that distinguish her as an expert; (2) the expert's testimony would help the jury understand an aspect of the evidence that it otherwise might not understand, without invading the province of the jury to weigh facts and make credibility determinations; and (3) the expert's testimony would reflect generally accepted scientific or technical principles. Simpkins, 297 Ill. App. 3d at 681, 697 N.E.2d at 310, citing People v. Enis, 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164 (1990). In Enis, a case that largely turned upon the credibility of eyewitnesses, the court cautioned against the overuse of expert testimony. Enis, 139 Ill. 2d at 289, 564 N.E.2d at 1165. The defense's expert witness, Dr. Solomon Fulero, planned to detail four areas where jurors tend to hold misconceptions about eyewitnesses and the identification process, including the following: (1) a confident witness is more likely to be accurate in her identification (in fact, there is no significant relationship between confidence and accuracy); (2) higher stress levels at the time of identification cause a witness to be more accurate (actually, studies show the opposite to be true); (3) identification is more accurate where a weapon was present (again, the opposite is true); and (4) jurors give too much

- 34 -

weight to time estimates.  _Enis_, 139 Ill. 2d at 285, 564 N.E.2d at 1163.  The trial court granted the State's motion _in_ _limine_ to preclude expert testimony by Dr. Fulero, reasoning that the testimony would amount only to speculation.  _Enis_, 139 Ill. 2d at 285, 564 N.E.2d at 1163.

The supreme court affirmed, reasoning that in weighing the probative value of the expert's testimony against the likelihood of prejudice, the trial court should "carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before him."  _Enis_, 139 Ill. 2d at 290, 564 N.E.2d at 1165.  In _Enis_, Fulero's testimony would not have aided the jury in reaching its conclusion.  _Enis_, 139 Ill. 2d at 288, 564 N.E.2d at 1164.  For example, the last three "misconceptions" to which Dr. Fulero planned to testify were not even relevant to the case at hand.  _Enis_, 139 Ill. 2d at 288-89, 564 N.E.2d at 1164-65.  The State's eyewitnesses did not observe defendant under stressful situations involving a weapon and did not testify concerning time estimates.  _Enis_, 139 Ill. 2d at 288-89, 564 N.E.2d at 1164-65.  Therefore, the trial court did not abuse its discretion in excluding Dr. Fulero's expert testimony. _Enis_, 139 Ill. 2d at 289, 564 N.E.2d at 1165.  Though eyewitness confidence may have been relevant, it was not enough to tip the scales in favor of remanding to allow Dr. Fulero's testimony. _Enis_, 139 Ill. 2d at 289, 564 N.E.2d at 1165. The court then stated:

"We caution against the overuse of

expert testimony. Such testimony, in this case concerning the unreliability of eyewitness testimony, could well lead to the use of expert testimony concerning the unreliability of other types of testimony and, eventually, to the use of experts to testify as to the unreliability of expert testimony. So-called experts can usually be obtained to support most any position. The determination of a lawsuit should not depend upon which side can present the most or the most convincing expert witnesses. We are concerned with the reliability of eyewitness expert testimony [citations], whether and to what degree it can aid the jury, and if it is necessary in light of defendant's ability to cross-examine eyewitnesses. An expert's opinion concerning the unreliability of eyewitness testimony is based on statistical averages. The eyewitness in a particular case may well not fit within the spectrum of these averages. It would be inappropriate for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable." Enis, 139 Ill. 2d at 289-90, 564 N.E.2d at 1165.

Courts have applied reasoning similar to that set forth in Enis where the issue is the admissibility of expert testimony concerning a sexual-abuse or assault victim's behavior. "In a prosecution for an illegal sexual act perpetrated upon a victim, including but not limited to prosecutions for violations of [s]ections 12-13 through 12-16 of the Criminal Code of 1961, *** testimony by an expert, qualified by the court relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence." 725 ILCS 5/115-7.2 (West 2002); see also Simpkins, 297 Ill. App. 3d at 682-83, 697 N.E.2d at 311-12 (expert testimony concerning recantation of allegations by child sex abuse victims excluded). However, as implied by this court in Simpkins, section 115-7.2 is not a "free pass" to allow in all expert testimony concerning the symptoms and behavioral characteristics of child victims of sexual abuse. Simpkins, 297 Ill. App. 3d at 681-82, 697 N.E.2d at 310-11.

In Simpkins, the trial court allowed an expert to testify regarding the tendency of child victims of sexual abuse to recant their accusations where family is unsupportive or blames the child victim for the negative repercussions of his accusations. Simpkins, 297 Ill. App. 3d at 683, 697 N.E.2d at 311. However, the State did not present any evidence that the child victim at issue in that particular case had an unsupportive family or felt like a scapegoat. Simpkins, 297 Ill. App. 3d at 683, 697 N.E.2d at 311-12. In part because of this, the court held that the expert testimony did not help the jury in making

its decision, and that, stripped to its basic level, the expert's testimony constituted an improper commentary on the victim's credibility. Simpkins, 297 Ill. App. 3d at 683, 697 N.E.2d at 312. Simpkins relied largely upon Enis, noting that in Enis, the expert testimony would not have aided the trier of fact because the testimony regarding "myths" of eyewitness testimony had little or no similarities to the eyewitnesses in that case. Simpkins, 297 Ill. App. 3d at 683, 697 N.E.2d at 312.

The majority distinguishes Simpkins on the ground that the expert in our case "found support in the testimony of the lay witnesses." Slip op. at 25. Dr. Appleton testified that teen victims of sexual abuse often provided delayed and piecemeal reporting due to shame. The victim at issue here did in fact testify regarding her delayed and piecemeal reporting, stating, "This is something very personal. It's not something you tell everyone. *** I was ashamed. I was scared." Our case is indeed different from Simpkins in that the expert's testimony involved more than just a "stereotyped generalization" of child victims. See People v. Wilson, 246 Ill. App. 3d 311, 322, 615 N.E.2d 1283, 1289 (1993) ("stereotyped generalizations" of child victims generally not admissible).

However, that the expert in Simpkins offered a stereotyped generalization of child victims rather than information relevant to the particular child at issue was merely one factor in our determination that the expert testimony should have been excluded. In Simpkins, we also relied upon the

expansive cautionary language of <u>Enis</u>, quoted above, as well as <u>Wilson</u>, 246 Ill. App. 3d at 320, 615 N.E.2d at 1288, which held that expert testimony concerning the tendency of young children to make false accusations in order to please investigators or parents "would not have provided the jury with much--if any--information beyond the knowledge of an average layperson." <u>Simpkins</u>, 297 Ill. App. 3d at 682, 697 N.E.2d at 311.  As stated in <u>Enis</u>, it is fairly easy to find an expert to support most any position.  <u>Enis</u>, 139 Ill. 2d at 289, 564 N.E.2d at 1165.

That the victim in this case provided delayed and piecemeal reporting because she felt ashamed could have been presented through examination of the witness just as easily as through expert testimony.  See <u>Enis</u>, 139 Ill. 2d at 289, 564 N.E.2d at 1165 (expert testimony is discouraged where it is not necessary in light of the defendant's ability to cross-examine the witnesses).  The victim in this case was 16 years old at the time of the offense and nearly 20 at the time of trial.  The victim presumably would have been perfectly capable of explaining her delayed and piecemeal reporting to the jury for herself; she was 20 years of age and had nearly 4 years to mentally process all that had allegedly happened to her.  It was the role of the jury to determine whether the victim's explanation for any apparent inconsistencies was reasonable and credible.  Experts undoubtedly carry a certain aura of authority and their mere presence improperly adds weight to the prosecution's case.  The introduction of Dr. Appleton's testimony under these

circumstances invaded the province of the jury to determine the victim's credibility and did not introduce specialized principles of which laypersons may not already be aware on a commonsense level.